**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  - against -<br><br>JOOHYUN BAHN,<br><br>  Defendant. | )<br>)<br>)<br>)   No. 16-cr-831(ER)<br>)<br>)<br>)<br>)<br>) |

**<u>SENTENCING MEMORANDUM ON BEHALF OF JOOHYUN BAHN</u>**

DAVID PATTON
Federal Defenders of New York, Inc.
BY: JULIA GATTO
*Of Counsel*
52 Duane Street – 10th Floor
New York, New York 10007

PATRICK MORONEY
SUSHILA RAO
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
*Pro Bono Counsel*

*Attorneys for Defendant Joohyun Bahn*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

    I.      Mr. Bahn's Middle-Class Upbringing in South Korea ............................4

    II.     Mr. Bahn's Life in America....................................................................4

    III.    Mr. Bahn Begins Working on the Landmark 72 Deal ............................6

    IV.    Mr. Bahn Meets Malcolm Harris ...........................................................7

    V.     Harris Devises a New Plan .....................................................................8

    VI.    Keangnam—and Mr. Bahn—Grow More Desperate ...........................10

    VII.   Revelations of Widespread Bribery at Keangnam and the Deal's Collapse..........11

    VIII.  Mr. Bahn's Arrest Dooms His Uncle's Presidential Bid ......................12

    IX.    Mr. Bahn Cooperates and Assists Law Enforcement ...........................13

SENTENCING GUIDELINES................................................................................................15

    I.      The Gain/Loss Enhancement ................................................................16

    II.     Guidelines Calculation..........................................................................17

SECTION 3553(A) FACTORS ..............................................................................................20

    I.      There Was No Intent To Harm ..............................................................20

    II.     As a Non-Citizen, Mr. Bahn Faces Significant Collateral Consequences............22

    III.    Mr. Bahn Has Fully Accepted Responsibility ......................................25

    IV.    A Non-Custodial Sentence is Necessary to Avoid Unwarranted Sentencing Disparities ...........................................................................27

    V.     A Noncustodial Sentence Allows for Prompt Restitution ....................29

#91189072v9

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Gall v. United States,
    552 U.S. 38 (2007) ............................................................................................ 14

Shu Feng Xia v. United States,
    No. 12-CR-934 (RA), 2015 WL 4486233 (S.D.N.Y. July 20, 2015) ................................ 23

United States v. Adelson,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................................ 14, 16, 22

United States v. Algahaim,
    842 F.3d 796 (2d Cir. 2016) .................................................................... 14, 16

United States v. Bahel,
    662 F.3d 610 (2d Cir. 2011) ........................................................................ 17

United States v. Chin Chong,
    No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014) ........................................ 23

United States v. Corsey,
    723 F.3d 366 (2d Cir. 2013) .................................................................... 15, 16

United States v. Dorvee,
    616 F.3d 174 (2d Cir. 2010) .................................................................... 14, 15

United States v. Esquenazi and Rodriguez,
    No. 09-cr-21010 (S.D. Fla.) ........................................................................ 28

United States v. Faibish,
    No. 12-CR-265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) ............................... 17

United States v. Fernandez,
    443 F.3d 19 (2d Cir. 2006) ......................................................................... 25

United States v. Gupta,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ............................................................... 17

United States v. Hirsch,
    No. 15-cr-00358 (D.N.J. 2015) ..................................................................... 28

United States v. Jefferson,
    No. 07-cr-209 (E.D. Va.) ........................................................................... 27

United States v. Johnson,
    No. 16-CR-457 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ............................... 16

United States v. Nelson,

#91189072v9

732 F.3d 504 (5th Cir. 2013) ................................................................................................... 18

United States v. Novak,
    No. 05-cr-180 (E.D. Wash.) ........................................................................................... 28

United States v. Parris,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ........................................................................... 17

United States v. Perez,
    No. 16-cr-01164 (S.D. Tex. 2016) .................................................................................. 28

United States v. Thavaraja,
    740 F.3d 253 (2d Cir. 2014) ..................................................................................... 20, 22

United States v. Trinh,
    No. 2:15-cr-00179(A)-CAS, 2017 WL 3835138 (C.D. Cal. Aug. 31, 2017) ..................................... 18

## STATUTES

18 U.S.C. § 3553(a) ................................................................................................. *passim*

On September 6, 2018, Dennis Bahn will appear before this Court for sentencing, pursuant to his guilty plea to one count of violating the Foreign Corrupt Practices Act ("FCPA") and one count of conspiring to violate the FCPA.  Mr. Bahn respectfully submits this memorandum to assist the Court in determining a sentence that will be sufficient, but not greater than necessary.  In light of Mr. Bahn's role in the offense and the collateral consequences of his guilty plea—including with respect to immigration—we ask the Court to impose a non-incarceratory sentence that includes house arrest, probation, and any other conditions the Court deems necessary.

## INTRODUCTION

Mr. Bahn stands before the Court because of conduct he engaged in while attempting to strike a deal to save Keangnam Enterprises ("Keangnam"), a South Korean construction conglomerate in desperate need of funding.  Keangnam retained Mr. Bahn, who worked in commercial real estate in Manhattan, to help sell the company's trophy property in Hanoi, Vietnam. The transaction took on special importance for Mr. Bahn, not just because it was his first international deal:  Keangnam was also responsible for the livelihood of hundreds of employees in South Korea, including Mr. Bahn's elderly father.

Things looked especially promising when Mr. Bahn met Malcolm Harris, a seemingly well-connected entrepreneur who offered to use his network to help find a buyer (in exchange for a share of the sale fee).  But after nearly one year without progress, Mr. Bahn and Keangnam began to grow desperate.  That's when Harris offered a solution: payment of a $500,000 bribe that Harris assured would secure a buyer.  There was no buyer, however, and through an elaborate series of lies and forgeries, Harris convinced Mr. Bahn and Keangnam to wire him the $500,000, which he stole.

Mr. Bahn knew that assisting with what he and Keangnam thought was a bribe was wrong. He also knew that it was wrong to make misrepresentations to Keangnam about the progress of the

deal in order to buy more time, convinced that Harris would eventually come through.  He focused on closing the deal at all costs—and securing the funding that Keangnam needed—without regard to the means.  Mr. Bahn has acknowledged that he broke the law and accepts that there must be consequences.  We ask that those consequences reflect proportionality and reason.

Based on a deeply flawed Guidelines provision, the government seeks a term of imprisonment between 70 and 87 months—nearly twice as long as the sentence that Harris received and near the top of any sentence ever imposed in an FCPA case.  A sentence in this range cannot be squared with 18 U.S.C. § 3553(a) or with common sense.  In recognition of the absurdity of such a sentence, the Probation Department has made a rare recommendation for a downward variance of almost four years below its calculated Guidelines range.  We join in the Probation Department's recommendation for a variance.  But in light of the § 3553(a) factors and our lower (correctly calculated) Guidelines range, we respectfully ask that the Court impose a non-custodial sentence.

In considering the appropriate sentence, we ask the Court to take into account Mr. Bahn's role in the offense and his intentions.  Keangnam's executives understood the nature of the payment and approved it.  This was not the first time Keangnam paid a bribe; as subsequent events showed, Keangnam created a multimillion dollar slush fund and was in the business of paying bribes.  Mr. Bahn had never before been involved in such a scheme.  And although Mr. Bahn made misrepresentations to Keangnam about the status of the deal after the payment was made, he did so in an attempt to secure more time for Harris to fulfill his end of the deal, hoping to preserve his—and his family's—reputation.  Unlike Harris, Mr. Bahn was not attempting to enrich himself at Keangnam's expense: Mr. Bahn would only receive a commission if Keangnam secured the financing that it needed.

2

Mr. Bahn's personal history and characteristics also counsel in favor of a non-custodial sentence. He has no prior criminal record. He and his wife of six years have two young children, ages six and four. Perhaps most importantly, although Mr. Bahn has resided lawfully in the United States for nearly twenty years, he is a citizen of South Korea. Any term of imprisonment will have significant immigration consequences; a term of 12 months or more will result in Mr. Bahn's deportation.

Mr. Bahn has accepted responsibility for his conduct and has provided assistance to law enforcement. After his arrest, he voluntarily provided FBI agents with a complete description of his involvement in the events, answering all of the agents' questions. He answered additional questions that the U.S. Attorney's Office posed after he retained counsel. And he accepted the SEC's request for two detailed attorney proffer sessions and has agreed to resolve the SEC's charges without requiring an enforcement proceeding.

We do not mean to suggest that Mr. Bahn should escape punishment for his actions. But in view of the severe immigration, employment, and financial consequences he has faced and will face after his sentence; his role in the offense; and the assistance he has provided law enforcement, we submit that an additional term of imprisonment is not necessary to satisfy the purposes of sentencing. A significant term of probation, including house arrest, will provide the necessary punishment while allowing Mr. Bahn to remain in the country with his young children, working to pay restitution.

## STATEMENT OF FACTS

As the attached letters of support illustrate, Mr. Bahn's life has been animated by two main values: hard work and dedication to family. Since immigrating to the United States to attend college, Mr. Bahn has been a loyal husband and loving father who works hard to support his family.

I.      Mr. Bahn's Middle-Class Upbringing in South Korea

Joohyun "Dennis" Bahn was born in Seoul, South Korea in 1978, the younger of his parents'
two children.  The family was, in the words of Mr. Bahn's mother, an "average middle-class
paycheck to paycheck" household.[1]  Mr. Bahn's father worked at a bank, and, like most other
Korean families, Mr. Bahn's mother did not work outside of the home and was responsible for the
children.  As was also typical of traditional Korean homes, Mr. Bahn's parents instilled in him an
overwhelming emphasis on filial piety and respect for elders.  Mr. Bahn's childhood was simple,
happy, and centered around his family.

For as long as he can remember, Mr. Bahn has known that his father's brother, Ban Ki Moon,
was an important person.  As Mr. Bahn got older, he began to appreciate his uncle's political
prominence.  As was the case for many other young Koreans who came of age during Ki Moon's
political ascent, Ki Moon's story of hard work was an inspiration to Mr. Bahn: Ki Moon grew up in
difficult economic conditions (alongside Mr. Bahn's father and his other siblings); lived in a remote
mountainside village during the Korean War; and applied himself in school to become one of South
Korea's top diplomats.  Of course, for Mr. Bahn, Ki Moon's success story was more personal.  But
apart from occasional interactions at family gatherings, Mr. Bahn did not share a close relationship
with his uncle.  Nor did Ki Moon's professional success spare Mr. Bahn or his family from the
inevitable rough patches of life.

II.     Mr. Bahn's Life in America

Indeed, the Bahn family went through a particularly difficult period in 1997 when Mr.
Bahn's father lost his job during the East Asian Financial Crisis, while Mr. Bahn was in his final

---

[1] See Exhibit 1.1.

years of high school.  As the only son in his family, Mr. Bahn faced mounting pressure to succeed.

He decided to move to the United States to take advantage of the opportunities for higher education.

Although Mr. Bahn had few options when he first arrived in 1999, he worked hard to put himself in

the best possible position for future success.  Mr. Bahn attended Oakland University in Rochester

Hills, Michigan, and Metropolitan State University of Denver before transferring to Baruch College,

from which he earned his bachelor's degree.  All the while, Mr. Bahn supported himself by working

nearly full-time in various jobs, including as an after-hours cleaning person at a bank, a paralegal,

and in a Subway sandwich shop.  His parents, with whom he kept in close contact despite the

distance, encouraged him throughout his pursuit of a college degree.  Mr. Bahn's attendance at an

American university was a great source of pride for them.

  After finishing at Baruch, Mr. Bahn's first job was with Kensington Financial Services in

business development.  In 2008—during Mr. Bahn's fourth year at the firm—the company closed as

a result of the global financial crisis.  Mr. Bahn had been investing in real estate properties while he

worked and, when the firm closed, he decided to invest full time.  Using money he had saved during

his time at Kensington, he and a friend leased a property in SoHo, refurbished it, and began renting

spaces to small boutique designers.  Although the venture enjoyed some initial success, the

sputtering economy doomed the project, and Mr. Bahn lost most of his hard-earned savings.  Mr.

Bahn then spent less than a year at Terrace Capital, Inc., helping link commercial real estate

developers with financing through public and private lending institutions. While there, he was

involved in a dispute with a client and was sued along with the company's owner.  Although the

plaintiff voluntarily dismissed the action without any finding of liability or wrongdoing on Mr.

Bahn's part, he parted ways with Terrace Capital and spent most of 2012 maintaining and dealing

with investment properties he had purchased before the housing bubble collapsed.  This venture also failed and he lost most of the properties in foreclosure proceedings.

Although Mr. Bahn suffered financial and professional setbacks during this time, his personal life began to thrive.  In 2011, he met and fell in love with Miyoung Seol.  Not only did the couple share a similar background—having both grown up in traditional, tight-knit families in South Korea—they also shared a desire to start a family.  Mr. Bahn's first marriage ended in divorce because of his desire for children, which his former wife did not want.  Mr. Bahn married Ms. Seol in 2012 and they had their first child, a son named ████████, later that year.  In 2014, the couple's second child—their daughter, ████████—was born.

With the birth of his children, Mr. Bahn had the family he had dreamed of, and he worked hard to become the most supportive father that he could.  In her letter, Ms. Seol describes some of the ways that Mr. Bahn shows his love for his family: planning all-day activities with his children outside the house each Saturday so that Ms. Seol has time to study; supporting Ms. Seol through her mother's lung cancer diagnosis; and spending three hours mopping the entire house each Sunday night—insisting on boiling several pots of water to ensure a deep clean.[2]  Mr. Bahn's sister calls her brother and his children "inseparable."[3]

III.    Mr. Bahn Begins Working on the Landmark 72 Deal

After his marriage and the birth of his son, Mr. Bahn felt the need for more stability in his professional life.  He veered away from his entrepreneurial endeavors and personal investment

---

[2] See Exhibit 1.2.

[3] See Exhibit 1.3.

properties.  He sent his resume to a number of real estate development firms and was hired by Marcus & Millichap Capital Corporation.

In early 2013, just as Mr. Bahn began his new job, his father—who had retired from the banking industry and served as an advisor to Keangnam—offered him an opportunity.  The Landmark 72 tower in Vietnam, which was one of the company's trophy properties, was not generating revenue consistent with its potential value, due to economic conditions in Vietnam. Keangnam's initial construction loans were soon coming due, and the company needed to secure funding for the building.

Landmark 72 presented Mr. Bahn with the opportunity to make an immediate impact in his new role: to close his first international deal and generate a sizeable commission for himself and his new firm.  But, perhaps more importantly, finding a buyer for Landmark 72 would help a major South Korean company and preserve the jobs of hundreds of its employees—giving Mr. Bahn the chance to earn the esteem of his friends and family, especially his father and uncle.

IV.    <u>Mr. Bahn Meets Malcolm Harris</u>

Mr. Bahn initially reached out to several large investment banks about the deal, but made limited progress.  In March 2013, Mr. Bahn became acquainted with Malcolm Harris through an arts publication that Mr. Bahn worked on in his spare time.  Harris represented himself as a major player in the Manhattan social scene, and Mr. Bahn thought Harris was one of the most well-connected individuals he had ever met.  Harris lived in a multimillion dollar Tribeca loft; consistently talked about his ties to celebrities; and had an extensive social media presence that appeared to confirm the stories he told Mr. Bahn.  When Harris offered to use his connections to help with Landmark 72, in exchange for a cut of the final commission, Mr. Bahn gladly accepted.

Harris encouraged Mr. Bahn to focus on sovereign wealth funds in the Middle East—in particular, the Abu Dhabi Investment Authority, where Harris claimed to have a contact who could ensure that the deal was reviewed.  By June of 2013, the focus quickly shifted after Qatar's ruler abruptly abdicated and transferred power to his 33-year-old son.  Harris took advantage of this development and, touting his purportedly longstanding ties to the new Qatari Emir, encouraged Mr. Bahn to concentrate his efforts on the Qatar Investment Authority ("QIA").  When the new Qatari Emir visited New York in September for the United Nations summit, Harris claimed that he hand delivered to him a letter describing the Landmark deal, and Harris encouraged Mr. Bahn to purchase gifts for the Emir and his entourage during the visit.

Throughout late 2013, Mr. Bahn repeatedly asked Harris to arrange a meeting between members of the QIA and Keangnam, which was beginning to face concerns about its cash flow.  In each instance, Harris declined to make an introduction, but assured Mr. Bahn that the project was being closely reviewed.  Yet, by all outward accounts the deal had stalled.

V.    Harris Devises a New Plan

In early 2014, Harris upped the ante.  He claimed that his old contact left QIA, that he had a new contact, and that this contact would require a bribe to facilitate QIA's purchase of Landmark 72. Specifically, Harris explained, his QIA contact would require an upfront payment and an additional payment after the deal closed.  Faced with the prospect of failing to complete the deal, the lack of progress over the preceding year, and Harris's guarantee that the payment would assure the QIA's participation, Mr. Bahn agreed to present the proposal to Keangnam.  After Mr. Bahn discussed the proposal with his father and with other Keangnam executives, Keangnam agreed to make a $500,000 upfront payment.

Keangnam's executives, however, decided that a $500,000 payment to a fashion blogger in Brooklyn could raise creditors' suspicions.  Instead, Keangnam wired the funds to Colliers International New York ("Colliers"), a top-tier global real estate firm where Mr. Bahn had recently accepted a job.  Using this wire as proof that the deal was advancing, Mr. Bahn and a colleague, John Woo, arranged for a local businessman, Jin Sup An, to pay $500,000 to Harris.  Mr. Bahn and Woo assured An that he would be repaid once the deal closed.  After Harris received the payment, Mr. Bahn asked for documentation showing that the funds had been forwarded to Harris's contact at the QIA.  Harris never provided confirmation.

We now know why: Harris was not in contact with his purported source at the QIA.  Nor did he use the payment to help Keangnam secure funding.  Instead, Harris kept the money for himself, and within one year spent nearly the entire $500,000 on lavish personal expenditures.  Harris skillfully hid his scheme from Mr. Bahn, who believed that he had all but secured the funding Keangnam needed: QIA would approve the deal within a matter of months, and both sides would hire law firms to perform due diligence and finalize the terms of the deal.  Keangnam hired a prominent Korean law firm, and, after Harris indicated that the QIA had not yet retained a firm, Mr. Bahn recommended several well-known U.S. firms that could advise the QIA.

Mr. Bahn appreciated that paying a bribe was wrong, but he did not understand the FCPA. Although he signed a form acknowledging Colliers's anti-bribery policy when he joined the company, he never received training on the FCPA.  As far as he was aware, bribery was a necessary part of doing business in certain regions—a misguided view that his discussions with Harris and Keangnam's executives reinforced.  Mr. Bahn certainly did not understand that, by facilitating a bribe from a South Korean company to an individual in Qatar, he was violating United States law.

VI.     Keangnam—and Mr. Bahn—Grow More Desperate

In the months after the payment, the QIA provided no signs that the deal was progressing.
As time passed, Keangnam's executives grew increasingly frustrated as the company's financial
condition worsened.  Keangnam asked for daily updates from Mr. Bahn, who tried to answer the
company's questions while hounding Harris for updates.  Yet without a concrete sign of progress,
Mr. Bahn grew increasingly desperate—concerned that the deal would fall through, Keangnam
would be forced to declare bankruptcy, and he and his family would be blamed.  When Keangnam
demanded an official status report by June 30, Mr. Bahn could not provide any confirmation other
than Harris's assurances and emails that appeared to have been sent to Harris from QIA—all of
which, we now know, Harris had fabricated.

To meet Keangnam's deadline, Mr. Bahn drafted what appeared to be a letter from the QIA
affirming the fund's commitment to the deal.  Mr. Bahn asked Harris to ensure that the contents of
the letter were consistent with what QIA had told Harris—which Harris "confirmed"—and then Mr.
Bahn sent the letter to Keangnam.  Mr. Bahn's communications reflect that he knew that sending the
letter was wrong but he felt that he did not have any other options.

The letter gave Mr. Bahn and Harris additional time to close the deal.  A successful closing
seemed all but certain when, in September, Harris forwarded an executed Letter of Intent ("LOI")
from QIA, purportedly signed by a director.  The letter committed QIA to a closing by the end of
October.  As with every other communication that Harris sent from QIA, the letter was forged, and
the relevant QIA employee later confirmed that he had never signed the letter or been in contact with
Harris.

Months passed and the end of 2014 approached.  Keangnam, facing mounting financial
pressure, demanded proof of QIA's commitment.  Instead of cutting his losses and explaining to

Keangnam that there had been no progress since the LOI, Mr. Bahn again attempted to buy more time to close the deal.  He forwarded to Keangnam a forged letter from a UK bank that purported to show that QIA had put funds into escrow for the anticipated purchase.  In early 2015, he created a fictitious email account in the name of Harris's purported QIA contact to provide "updates" about the deal.  Mr. Bahn remained confident that the deal would close if he gave QIA enough time.

Mr. Bahn's intuition seemed to be confirmed when he exchanged emails about the deal with a co-Head of Asian Real Estate at Qatar Holdings (a subsidiary of QIA).  The Qatar Holdings team followed up with a call with Mr. Bahn in early February 2015, where they posed detailed questions about Keangnam's valuation of the building and assessment of the surrounding property.  Harris took credit for the successful call, claiming to Mr. Bahn that it occurred at the direction of his contact (i.e., the individual to whom he purported to pay the $500,000).  Harris told Mr. Bahn that his contact would continue to manage the deal at the highest levels of QIA while the Qatar Holdings team would be responsible for day-to-day matters.

VII.    Revelations of Widespread Bribery at Keangnam and the Deal's Collapse

Yet despite these signs of progress, the deal again stalled in 2015.  And in April 2015, it fell apart for good.

Several months earlier, Korean authorities began investigating Keangnam for various corruption offenses.  In particular, the company was accused of improperly securing $73 million in government loans by exaggerating future profits from a Russian oil project.  Investigators were also examining allegations that the company diverted revenues to create a $23 million slush fund for political bribes.  As the investigation into these crimes gained steam, Keangnam's chairman committed suicide.  In a suicide note, he detailed the amounts of bribes paid to various politicians, which ignited a national scandal.

11

In the course of reviewing Keangnam's financial records, the Korean media identified the $500,000 payment to Colliers, confirmed that Ban Ki Moon's nephew worked on the deal, and accused Mr. Bahn of having stolen the money.  After these allegations became public, Colliers fired Mr. Bahn, John Woo, and the senior member of the deal team, all of whom had been in close contact about the deal.  Colliers, however, retained a substantial portion of the $500,000 that Keangnam had paid it.[4]  Separately, a court in South Korea entered a judgment against Mr. Bahn for the $500,000 that Keangnam paid Colliers.

VIII.   Mr. Bahn's Arrest Dooms His Uncle's Presidential Bid

By May 2015, the attempted bribe payment was uncovered, reported to the SEC and DOJ, and was the subject of a number of news articles.  On January 10, 2017—nearly 20 months after Colliers fully disclosed the conduct—Mr. Bahn was arrested.

The timing of Mr. Bahn's arrest coincided with the conclusion of Mr. Bahn's uncle's term as U.N. Secretary-General and reports that Ban Ki Moon intended to run for the presidency of South Korea.  Mr. Bahn was arrested the day before Ki Moon was scheduled to board a flight out of John F. Kennedy airport to return to his native South Korea after ten years in New York.  As a result, instead of focusing on his run, Ki Moon was forced to respond to press inquiries about the indictment against his brother and nephew when he left for and arrived in Seoul.[5]

---

[4] Colliers retained approximately $275,000; it had paid Mr. Bahn approximately $225,000.

[5] See, e.g., Christine Kim, Ex-U.N. Chief Bank Ki-Moon Is 'Perplexed and Embarrassed' by His Relatives' Bribery Case, Time, Jan. 12, 2017, http://time.com/4632485/un-ban-ki-moon-relatives-bribery/ (describing statement Ki Moon gave to reporters at JFK airport on January 11); Is Ban Ki-moon's South Korea Presidential Bid in Trouble, TRTWorld, Jan. 12, 2017, https://www.trtworld.com/asia/is-ban-ki-moons-south-korean-presidential-bid-in-trouble-273552 ("Ban Ki-moon was not mentioned in the U.S. indictment, however, his arrival to South Korea on Thursday [January 12, 2017] was clouded by the bribery scandals involving his family members.").

Before the charges, Ki Moon was considered a favorite to win the election.[6]  But, less than a month after Mr. Bahn's arrest, Ki Moon withdrew from the race.  Nearly every political analysis of Ki Moon's short-lived presidential bid counts the indictment of Mr. Bahn and his father among the reasons for the failure of Ki Moon's presidential bid.[7]

As with many criminal defendants, Mr. Bahn's arrest was deeply humiliating, but for Mr. Bahn that shame was amplified.  Mr. Bahn was raised to revere his elders and particularly his uncle, whose international prominence was a source of pride—not only for Mr. Bahn's immediate family, but also for South Korea as a whole.  Mr. Bahn is profoundly aware that his poor judgment and decisions may have cost his uncle a chance at the South Korean presidency.

IX.    Mr. Bahn Cooperates and Assists Law Enforcement

From the moment of his arrest, Mr. Bahn has accepted responsibility and assisted law enforcement.  On the day he was taken into custody, Mr. Bahn forthrightly answered all of the agents' questions during an hour-and-a-half interrogation.  Even after appointment of counsel and *without* the benefit of a cooperation agreement, Mr. Bahn voluntarily continued to answer the government's questions.  Mr. Bahn has also attempted to help law enforcement—with nothing concrete in return—by trying to secure a New York-based lawyer for his father, a co-defendant on

---

[6] Id. ("Ban, a former South Korean foreign minister, is among the front-runners in polls to succeed Park."); see also Wale Odunsi, Ban Ki-moon May Emerge Next South Korea President, Daily Post, Dec. 26, 2016, http://dailypost.ng/2016/12/26/ban-ki-moon-may-emerge-next-south-korea-president/; Isabella Steger, Ban Ki-moon is the Favorite to be South Korea's Next President, Whether He Likes It or Not, Quartz, Sept. 28, 2016, https://qz.com/795452/united-nations-secretary-general-ban-ki-moon-is-the-favorite-to-be-south-koreas-next-president-whether-he-likes-it-or-not/.

[7] See, e.g., Jonathan Cheng, Ban Ki-moon Drops Out of South Korean Presidential Race, The Wall Street Journal, Feb. 1, 2017, https://www.wsj.com/articles/former-u-n-secretary-general-ban-ki-moon-drops-out-of-south-korean-presidential-race-1485931698 ("Mr. Ban's reputation also took a hit after his brother and nephew were charged in a bribery case in the U.S., just as Mr. Ban was returning home."); Choe Sang-Hun, Ban Ki-moon Says He Won't Run for President of South Korea, The New York Times, Feb. 1, 2017, https://www.nytimes.com/2017/02/01/world/asia/ban-ki-moon-president-south-korea.html ("A bribery scandal that involved his younger brother and nephew also drew considerable news coverage.").

the Indictment who remains in South Korea.  The government appears to have no mechanism by which to bring Mr. Bahn's father to court for presentment without Mr. Bahn's assistance.

Mr. Bahn has similarly assisted the SEC with its investigation into the transaction, again without a cooperation agreement or anything in return.  At the SEC's request, Mr. Bahn—through counsel—provided detailed information to the SEC in hours-long proffers.  Through those proffers, Mr. Bahn again accepted responsibility while providing enforcement attorneys with information specific to their own investigation—such as Colliers's accounting decisions with respect to the $500,000 payment, and the involvement of Mr. Bahn's supervisors in the transaction.  Mr. Bahn has agreed to enter into a consent decree with the SEC that will be made public concurrently with his sentencing, allowing the SEC to resolve its case without litigation.

Since Mr. Bahn's arrest, despite the notoriety of his case and the cascading negative repercussions personally and professionally (including losing his teaching job at New York University), Mr. Bahn has continued to work and provide for his family.  As described by David Jankowitz, the principal of Paramount Advisory LLC to whom Mr. Bahn is currently a consultant, Mr. Bahn is a "hard worker" and "an incredible asset" to the firm.  As Mr. Jankowitz explains, "If the Court sends Dennis to jail, my firm will suffer in his absence."[8]  Mr. Bahn's family, to whom his devotion and energy has never waned, would be even more profoundly impacted in his absence, with his wife writing that incarceration and possible deportation would "destroy our family."[9]

---

[8] See Exhibit 1.4.

[9] See Exhibit 1.2.

## SENTENCING GUIDELINES

Courts must begin every sentencing proceeding by correctly calculating the Sentencing Guidelines range.  Gall v. United States, 552 U.S. 38, 49 (2007).  But while the Guidelines represent an "initial benchmark," they are "only one of the factors to consider" when imposing a sentence.  Id. at 49, 59.  The Second Circuit has repeatedly held that district courts may place greater weight on other factors when the Guidelines produce results that are, in Judge Rakoff's words, "absurd on their face."  United States v. Adelson, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), aff'd 301 Fed. App'x 93 (2d Cir. 2008); see United States v. Algahaim, 842 F.3d 796, 800 (2d Cir. 2016); United States v. Dorvee, 616 F.3d 174, 187 (2d Cir. 2010); see also United States v. Corsey, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, D.J., concurring) ("[T]he low marginal utility of the guideline in this very high intended loss case should have prompted greater, not lesser, reliance on the section 3553(a) factors other than the Guidelines.").

The Guidelines produce an irrational result in this case.  That is because Mr. Bahn's Guidelines range is driven almost entirely by the monetary gain/loss table (§ 2B1.1), which the guideline for FCPA offenses (§ 2C1.1) incorporates.  The Second Circuit, district courts, and commentators have leveled sharp criticism at the gain/loss table—both for the manner in which it was created and for the arbitrary and inflated results it produces.

In Mr. Bahn's plea agreement, the parties carved out a dispute regarding the appropriate enhancement to be added from the gain/loss table.  Because the sentencing must begin with a correct Guidelines calculation, we illustrate below why the appropriate range is 37-46 months and why the Government's proposed 70-87 month range is unsupported by the evidence.  But this analysis only highlights why this case is a prime example of the criticism that judges have levied against the

15

gain/loss table.  We urge the Court to give limited weight to the Guidelines, as Probation did by recommending a sentence well below either party's Guidelines range.

      I.      <u>The Gain/Loss Enhancement</u>

As the parties agree, § 2C1.1(a) provides the base offense level (of 12) in this case.  The parties also agree that the only enhancement to Mr. Bahn's offense level comes from § 2C1.1(b)(2).  That provision instructs that if "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500," the offense level should be increased based on the gain/loss table used for other economic offenses (§ 2B1.1(b)(1)).

That table has been the subject of frequent criticism.  As with other "fundamentally different" guidelines that the Circuit has expressed skepticism about, the gain/loss table "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices."  <u>Corsey</u>, 723 F.3d at 379 (Underhill, <u>D.J.</u>, concurring); <u>id.</u> at 379-80 (tracing the history of the gain/loss table).  As Judge Rakoff explained, the gain/loss table is representative of how the Guidelines over-emphasize arithmetic "in an effort to appear objective"; as a result, the Guidelines "tend to place great weight on putatively measurable quantities" without "explaining why it is appropriate to accord such huge weight to such factors."  <u>United States v. Adelson</u>, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006).

In a case where one defendant's offense level was doubled—and the other defendant's tripled—based on the gain/loss table, the Second Circuit remarked upon the "unusualness" of this approach to monetary offenses.  <u>United States v. Algahaim</u>, 842 F.3d 796, 800 (2d Cir. 2016).  Instead of selecting an offense level that represented a typical offense and adjusting for large or

small gain/loss amounts, the Circuit explained, the Commission set a low base offense level and

allowed gain/loss amount to become "the principal determinant of the adjusted offense level and

hence the corresponding sentencing range." Id. This approach, "unknown to other sentencing

systems," was "one the Commission was entitled to take, but its unusualness is a circumstance that a

sentencing court is entitled to consider." Id.

Courts in this Circuit have done so, imposing significantly below-Guidelines sentences while

criticizing the logic of the Sentencing Commission's approach. See, e.g., United States v. Johnson,

No. 16-CR-457(NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) ("As far as this court can

tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned

determination of how the punishment can best fit the crime, nor any approximation of the moral

seriousness of the crime."); United States v. Faibish, No. 12-CR-265(ENV), 2015 WL 4637013, at

*2 (E.D.N.Y. Aug. 3, 2015) ("The loss table is but one example of the seemingly mindless

acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines

regime."); United States v. Gupta, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (explaining that the

Sentencing Commission's singular focus on the amount of gain or loss from the offense has

"effectively guaranteed that many such sentences would be irrational on their face"); United States

v. Parris, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008) ("[I]t is difficult for a sentencing judge to place

much stock in a guidelines range that does not provide realistic guidance.").

II.     Guidelines Calculation

Mr. Bahn's offense level should be enhanced based on the $500,000 payment that he

facilitated to Harris (a 12-point base offense level plus a 12-point enhancement). With a three-point

reduction for acceptance of responsibility, his adjusted offense level is 21 and his Guidelines range is

37-46 months. The government's assertion—that Mr. Bahn and his colleagues reasonably expected

17

a $6.97 million profit if the deal went through, which would result in an 18-point enhancement and

cause Mr. Bahn's Guidelines range to nearly double to 70-87 months—is unsupported by the

evidence.

One would expect that, in every bribery case, the benefit expected from the payment will

exceed the amount of the payment.  But a defendant's Guidelines range may only be enhanced based

on the expected benefit if the evidence allows for a "reasonable estimate" of the benefit.  United

States v. Bahel, 662 F.3d 610, 646 (2d Cir. 2011).  The mere "expectation of receiving a large or

'substantial' amount of money is insufficiently specific" to form the basis of an expected benefit

calculation.  United States v. Nelson, 732 F.3d 504, 523-24 (5th Cir. 2013).  Section 2C1.1(b)(2)

allows for an enhancement based on alternative measures—including the value of the payment—

because, in some instances, the evidence does not permit a sufficiently reliable estimate of the

expected benefit.

That is the case here.  The commission that Mr. Bahn and his colleagues could have expected

to receive varied wildly over the course of negotiations, sometimes changing by the day.  That

amount was constantly in flux for several reasons: "demands" that Harris made on behalf of a party

that did not exist; Harris's own unpredictability; and Mr. Bahn's singular focus on closing the deal,

and not on finalizing commissions, which he anticipated would be discussed as closing became more

imminent.

Given the unique facts of this case, the government's proposed figure—and any figure based

on the "benefit to be received"—is too speculative for Guideline calculation purposes.  Instead, the

Court should base Mr. Bahn's § 2C1.1(b)(2) enhancement on the $500,000 payment.  Unlike the

government's proposal, the amount of the payment that was actually exchanged is not contradicted

by conflicting representations and is not contingent upon a series of speculative events.  The figure is undisputed, supported by bank records and other uncontested evidence.

To enhance Mr. Bahn's sentence based on the expected benefit, the Court would need to pick an arbitrary point during negotiations and evaluate conflicting statements by the participants.  If the Court were to pick any such point, it would be most logical to look to Mr. Bahn's expectation at the time the $500,000 payment was made.  See, e.g., United States v. Trinh, No. 2:15-CR-00179(A)-CAS, 2017 WL 3835138, at *6 (C.D. Cal. Aug. 31, 2017) (explaining that the "appropriate way to calculate the § 2C1.1(b)(2) enhancement under the Guidelines" is by "looking at the benefit 'to be received' at the time the bribe took place").  Although there are a number of conflicting statements, under the most plausible view of the evidence, Mr. Bahn could reasonably have expected to receive only $300,000 at the time of the payment.[10]

To be sure, Mr. Bahn and others involved in the deal discussed receiving a greater share of the commission at various points over the 13 months after the initial payment was made.  We understand the government's $6.97 million figure to be based on discussions about a revised fee structure that took place in September 2014—nearly six months after $500,000 payment was made to Harris.  But there is no reason why that point should control more than any other in the negotiations, when lesser fee amounts were discussed.  For example, as Keangnam's financial condition worsened in April 2015, Mr. Bahn offered the property to QIA for $200 million less than

---

[10]Specifically, based on facts that we do not believe the government will dispute, in April 2015 Keangnam committed to paying a 1.5% commission on a sale price of $800 million ($12 million), of which Mr. Bahn was entitled to 45% (a total of $5.4 million), with the remainder going to Colliers.  In a conflicting version of the agreement that Mr. Bahn presented to Colliers, Keangnam purportedly agreed to pay 2% on a price of $700 million (a total of $14 million, with Colliers receiving $7.7 million and Mr. Bahn $6.3 million).  Accordingly, it stands to reason that if the deal closed at $800 million, Keangnam paid 1.5%, and Colliers demanded the full $7.7 million, Mr. Bahn would earn $4.3 million.  However, a separate email that the government produced in discovery confirms that Mr. Bahn committed to pay Harris $4 million.  Because the government apparently acknowledges—and we agree—that amounts to be paid to Harris or to Colliers should be excluded from the calculation, Mr. Bahn could reasonably expect $300,000.

19

the original price.  Such a substantial reduction to the sale price would have resulted in a corresponding decrease in the amount Mr. Bahn and others would receive.

The debate between the parties' positions only highlights the criticisms that judges have leveled against the Sentencing Commission's approach to economic crimes.  To take one example, because Harris was negotiating on behalf of a fictional party, whatever sale price that Keangnam sought (through Mr. Bahn), was "accepted" by Harris's "source," and the resulting percentage-based commission to be paid to Mr. Bahn and Colliers would vary accordingly.  Depending on which point the Court selects in those negotiations, Mr. Bahn's Guidelines range could increase or decrease by years—without any meaningful difference in his culpability or the actual harm to society.

## SECTION 3553(A) FACTORS

Given these flaws in the Guidelines, it is more important than ever that the Court use them only "as a starting point and then make an independent sentencing determination" based on § 3553(a).  <u>United States v. Thavaraja</u>, 740 F.3d 253, 259 (2d Cir. 2014).  As the Court is aware, the sentence to be imposed must be "sufficient, but not greater than necessary" to comply with purposes of sentencing outlined in 18 U.S.C. § 3553(a)(2), taking into consideration the factors outlined in the statute.  Here, a within-Guidelines sentence would violate that statutory command.  Analysis of the § 3553(a) factors shows that a non-custodial sentence—including house arrest, strict supervision, and any other conditions the Court deems necessary—would be sufficient but not greater than necessary to fulfill the aims of sentencing.

I.      There Was No Intent To Harm

In considering the "nature and circumstances of the offense"—the first factor in the statute—we ask the Court to take into account Mr. Bahn's intent.  Keangnam was a major construction

conglomerate with projects around the world.  Like other family-owned Korean conglomerates,[11]

Keangnam was familiar with pay-to-play schemes: the company operated in environments where

corruption was common, and, as the events of April 2015 made clear, Keangnam used bribes to its

advantage.  Executives at the highest levels of Keangnam approved the $500,000 payment in this

case and fully understood its purpose.  The company was desperate to close the deal, and Mr. Bahn

facilitated the payment to secure the funding that Keangnam needed to survive.  He did so without

ever having worked on an international deal and without having received any FCPA training.

      This is not to excuse the misrepresentations that Mr. Bahn made or to minimize the fact that

Mr. Bahn facilitated what he believed to be a bribe.  But Mr. Bahn was not attempting to swindle

Keangnam or steal the company's money.  While he was to be paid a substantial amount upon a

successful closing, to Mr. Bahn this deal was about much more than a commission: his family's

reputation and his father's livelihood were on the line.[12]

      Mr. Bahn's intentions stand in contrast to Harris's.  While we may never know whether

Harris intended from the outset to make Mr. Bahn another one of his victims, the facts suggest as

much.  Within months of meeting Mr. Bahn, Harris encouraged him to make a $150,000 donation to

a "charity" in Harris's name.  The following year, when the time was ripe, Harris hatched the bribery

scheme.  He was the first to recommend bribing the individual at QIA and, once Keangnam was on

---

[11]See Andy Spalding, "South Korea: An Anti-Corruption Tiger," The FCPA Blog (Feb. 16, 2018), http://www.fcpablog.com/blog/2018/2/16/south-korea-an-anti-corruption-tiger.html (explaining that, to aid in recovery after the Korean war, "South Korea's strong-armed political leadership worked closely with large-scale, family-owned corporate conglomerates known as 'chaebol.' By economic terms, the formula was famously successful.  Unsurprisingly, corruption followed.").

[12] See, e.g., Letter from Miyoung Seol (Exhibit 1.2) ("[K]nowing my husband, he probably feels very bad inside at the fact that he didn't live up to expectation that everyone had for him and that he ultimately failed the people he was working for. He didn't lie to his clients to benefit him."); Letter from Youngmi Ban (Exhibit 1.3) ("[H]e was excited to work on the deal but with time he became physically and emotionally distraught over its progress, the somewhat unreasonable demands of his client, and the potential consequences for my father. My brother was desperately trying to please his client and my father.").

board, drove the scheme.  Harris negotiated on behalf of the purported contact at QIA and fed Mr.

Bahn the information that he knew Mr. Bahn would relay to Keangnam.

These differences lay bare the absurdity that results from the government's position.

Comparing Mr. Bahn's and Harris's conduct, it is difficult to see how Mr. Bahn could be deserving

of a harsher punishment than Harris.  After all, Harris designed the bribery scheme, perpetuated it

through multiple forgeries, and stole the $500,000 payment from Keangnam.  As if that were not

enough, while he was "negotiating" the Landmark 72 deal, Harris was simultaneously defrauding

another individual through an unrelated scheme.  And this was not the first time Harris engaged in a

scheme to defraud: Harris had already been convicted of multiple counts of fraud in this District and

served a prison term.  Yet, somehow, Harris faced a guidelines range of 63-78 months, and,

according to the government, Mr. Bahn should face a Guidelines range of 70-87 months.

This irrational result comes from what Judge Rakoff described as "the guidelines' fetish with

abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not

cabined by common sense."  United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006).

We urge the Court to employ a more practical approach.  Because Harris received a sentence of 21

months for his prior fraud convictions, we submit that the Court should use a range significantly

below 21 months as a more realistic guidepost than what the Guidelines offer, given that Mr. Bahn

did not intend to harm Keangnam (or anyone else).  Consideration of the following factors, we

submit, should drive the appropriate sentence even lower, into the range of a non-custodial

sentences.

II.     As a Non-Citizen, Mr. Bahn Faces Significant Collateral Consequences

District courts must also consider the need for the sentence to reflect the seriousness of the

offense, to promote respect for the law, to afford adequate deterrence, and to provide just

punishment.  18 U.S.C. § 3553(a)(2).  A non-custodial sentence satisfies those aims because the collateral consequences in this case—particularly with respect to immigration—cause Mr. Bahn's conviction to impact him more severely than a similarly-situated defendant.

The Second Circuit has held that when "determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice," a district court "may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family."  United States v. Thavaraja, 740 F.3d 253, 262-63 (2d Cir. 2014) (citation omitted).  District courts have frequently done so, and have explained their decisions to impose lesser sentences than they otherwise would have in order to account for immigration consequences.  See, e.g., Shu Feng Xia v. United States, No. 12-CR-934(RA), 2015 WL 4486233, at *10 (S.D.N.Y. July 20, 2015) (granting § 2255 motion to take immigration consequences into account at re-sentencing); United States v. Chin Chong, No. 13-CR-570, 2014 WL 4773978, at *7 (E.D.N.Y. Sept. 24, 2014) ("A court tasked with imposing a sentence that 'provides just punishment' is obliged to consider whether the defendant is likely to face deportation. This may require—as it does in the present case—a lesser term of imprisonment for noncitizen defendants than otherwise would be appropriate.").

As a legal permanent resident, Mr. Bahn's criminal conviction triggers a host of immigration consequences.  Most importantly, a sentence of twelve months' imprisonment or more will subject Mr. Bahn to mandatory deportation.  Any sentence of incarceration, given the current administration's shifting enforcement priorities, increases Mr. Bahn's risk of deportation.  And the mere fact of Mr. Bahn's conviction makes him removable, meaning that if he were to leave the country for any reason—such as to attend his parents' funerals—he would not be permitted to return.

Mr. Bahn has lived in this country for twenty years.  Deportation would require Mr. Bahn either to live on the other side of the world from his family, or displace his children from their lives here and move them to a country they have never visited.  Although the risk of deportation results entirely from Mr. Bahn's own decisions, we ask the Court to take these consequences into consideration when deciding whether an additional term of imprisonment is necessary.

Mr. Bahn's arrest and conviction resulted in other consequences.  He was fired from his job at Colliers and lost his teaching contract at NYU.  He will never be able to work for a publicly-traded company ever again, as a result of his felony conviction and the accompanying SEC resolution.  And, although Mr. Bahn has recently found work providing research support on real estate transactions in a back-office role, it is unlikely that he will ever be able to hold any job that has a client-facing role.

Mr. Bahn would not fare better in Korea.  The press there has accused him of stealing the $500,000 from Keangnam, an accusation that runs contrary to the indictment here and all available evidence.  A Korean court entered a judgment against Mr. Bahn that requires him to pay $500,000 to Keangnam's creditors.  As part of Mr. Bahn's plea agreement in this case, he will pay $500,000 in restitution to An, the individual that provided the loan.  Thus, Mr. Bahn will ultimately be liable for $1 million.  Colliers, we understand, has refused to pay back any of the portion of the $500,000 that it retained (and booked as revenue at the time).

Mr. Bahn's agreement to plead guilty unleashed a host of immigration, financial, and employment consequences.  Nobody, we submit, could look at the impact on Mr. Bahn's life and conclude that he escaped with minimal repercussions.  Compounding these consequences with a period of incarceration would go beyond what is necessary to punish Mr. Bahn for his role in the offense.

III.     Mr. Bahn Has Fully Accepted Responsibility

The Court must also consider the need for the sentence to protect the public from further crimes of the defendant, as well as the defendant's history and characteristics more generally.  18 U.S.C. § 3553(a)(1)-(2).  Mr. Bahn has never been arrested before this case, has maintained an impeccable record while released on bail, and has demonstrated that he accepts responsibility for his conduct.

Mr. Bahn's acceptance of responsibility extends beyond his decision to plead guilty and avoid a complex trial that would require witnesses from abroad.  He immediately accepted responsibility at the time of his arrest, waiving his right to counsel and providing detailed information about his conduct.  After his plea, he continued assisting the authorities and answering their questions about others' roles in the transaction.  Mr. Bahn cooperated with the SEC in their investigation and agreed to settle all civil claims in a manner that saved the courts and the SEC time and resources.  These actions, we submit, go above and beyond the three-point reduction reflected in Mr. Bahn's guideline range and should be taken into account in his sentence.  See United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006) (instructing courts to take into account the defendant's efforts to cooperate, even if those efforts did not result in a government motion, because § 3553(a) "includes the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation").

The PSR discusses two civil lawsuits in which Mr. Bahn was a named defendant.  Both relate to business disputes Mr. Bahn was involved in before the Landmark 72 transaction.  Although plaintiffs made allegations of fraud, neither case should give the Court any pause in concluding that Mr. Bahn will not commit another crime.

As described in more detail in the PSR, the first case relates to a property Mr. Bahn jointly owned with his friend, which went into foreclosure after the financial crisis.  After Mr. Bahn and his friend sold the property and used the proceeds to pay a portion of the mortgage, the property's ownership was transferred several times.  Mr. Bahn and his friend were ultimately sued by one of the new owners of the notes, who claimed that the new owner had not been fully paid.  Although Mr. Bahn initially contested the case, after several years of protracted litigation he could no longer afford an attorney and gave up defending the case, resulting in a default judgment.  The second lawsuit involves a corporation that hired Mr. Bahn to secure financing for a project, paying a deposit. Although Mr. Bahn initially secured financing, the deal fell apart, and the parties disputed under what terms the deposit was to be forfeited.  Ultimately, the parties settled out of court.

Mr. Bahn disputes many of the factual allegations underlying the civil lawsuits.  But these both predate the Landmark 72 transaction: one involves a property sold in 2009 and the other business dealings from late 2011.  And, in any event, these civil claims are qualitatively different from the criminal charges here.  Prior to the instant offense, Mr. Bahn had never been arrested; the experience left a lasting impression, including an early morning raid at his home conducted by a dozen FBI agents and serious collateral consequences.

Since Mr. Bahn's arrest, he has maintained a flawless record while on supervision and has taken nearly every step he can to cooperate with the government and demonstrate that he accepts responsibility for his crime.  Mr. Bahn has even paid tickets for motor vehicle violations incurred nearly twenty years ago when he was a college student in Michigan.  He has fully accepted responsibility for his conduct; the impact of a federal felony conviction, potential deportation, and the other financial and employment consequences are more than sufficient to ensure that Mr. Bahn will never break the law again.

IV.     <u>A Non-Custodial Sentence is Necessary to Avoid Unwarranted Sentencing Disparities</u>

Without minimizing the gravity of Mr. Bahn's offense, because § 3553(a) also requires consideration of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," we note that Mr. Bahn's conduct is far less culpable than that of other defendants who received sentences at—and even far below—the range the government seeks.  Instead, similarly-situated individuals received sentences in line with the range we seek.

Appendix A (Exhibit 2) lists every sentence imposed nationwide in individual FCPA cases, including the defendant's Guidelines range (where available).  The chart underscores that courts consistently find the Guidelines to be overly punitive: courts imposed a below-Guidelines sentence in over 93% of cases.[13]  Indeed, we identified only six cases nationwide where courts imposed a within-Guidelines sentence—including both pre- and post-<u>Booker</u>.[14]  In all but one of these cases the sentence was at the low end of the Guidelines range, and we found no case in which a court imposed an above-Guidelines sentence.

Courts frequently decline to impose a prison term in FCPA cases: in over 40% of cases, the defendant was sentenced either to probation or time served.[15]  When courts do impose a prison term, it is minimal: nearly 60% of defendants received a sentence of one year or less.[16]  Unsurprisingly,

---

[13] We include in this figure both below-Guidelines sentences (68 cases) and sentences where the Guidelines range was not ascertainable from the docket but the court imposed a sentence of time served or probation (13 cases), under the assumption that such sentences were almost certainly below the Guidelines.  As noted below, we identified only six cases where the Guidelines range was available from the docket and the Court did not impose a below-Guidelines sentence.

[14] This includes only those cases where the defendant's Guidelines range was available from the docket.

[15] The court imposed such a sentence in 39 out of 93 cases.

[16] 55 out of 93 defendants received a sentence less than or equal to one year and one day.

were the Court in this case to impose a sentence at even the low end of the government's Guidelines

range—70 months—it would be the fourth highest sentence in our table of 93 sentences.  The only

three defendants with higher sentences were all convicted of 10+ counts after trial.  One was a

United States Congressman from Louisiana whom a jury convicted of paying and receiving bribes

over the course of five years, using his official position to further his personal interests and storing

money in his freezer.[17]  The other two were co-owners of a Florida company involved in paying

multiple bribes, as part of multiple schemes, to a Haitian telecommunications company.[18]  All faced

significantly higher Guidelines ranges than Mr. Bahn.

A number of FCPA defendants who paid substantial bribes over extended periods of time

have received sentences lacking in jail time altogether.  For example, Richard Hirsch worked as a

senior vice president at a New Jersey-based construction management company that paid $3.9

million in bribes to secure foreign government construction management contracts over the course of

ten years.  Many of these bribes were paid to foreign officials in the regions Hirsch oversaw.

Although Hirsch faced a Guidelines range of 57-71 months' imprisonment, he was sentenced to two

years' probation.[19]   Similarly, Richard Novak profited from a scheme in which payments were

made to foreign officials to certify forged university degrees.  He pleaded guilty to wire fraud and

FCPA charges, and though he faced a Guidelines range of 46-57 months, he received two-and-a-half

---

[17] See United States v. William Jefferson, No. 07-cr-209 (E.D. Va.).  Jefferson, who faced a Guidelines range of 262-372 months, was sentenced to 156 months' imprisonment, which was eventually reduced to 65 months after appeal.

[18] See United States v. Joel Esquenazi and Carlos Rodriguez, No. 09-cr-21010 (S.D. Fla.).  Esquenazi faced a Guidelines range of 292-365 months and was sentenced to 180 months' imprisonment; Rodriguez faced a Guidelines range of 151-188 months and was sentenced to 84 months' imprisonment.

[19] See United States v. Richard Hirsch, No. 15-cr-00358 (D.N.J.).

years of probation.[20]  Daniel Perez, too, received probation for his roles in bribing Mexican officials over the span of ten years, paying bribes totaling $2 million, after facing a Guidelines range of 57-71 months.[21]  While each of these cases is fact-specific—with the court considering the defendants' health, cooperation with authorities, and extent of involvement in the scheme, among other factors—the underlying conduct is no less serious than Mr. Bahn's.

Here, we do not ask for a sentence of only probation.  We recognize that additional conditions may be appropriate, including a period of house arrest.  But given the other consequences Mr. Bahn faces—immigration, employment, and financial—his conviction already carries greater punishment than those imposed on individuals described in the preceding paragraph (none of whom raised immigration consequences at sentencing).  Considering especially the nationwide trends in FCPA sentencing, a prison term here would create a disparity in sentences.

V.     A Noncustodial Sentence Allows for Prompt Restitution

Finally, the Court must consider the "need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(7).  Here, the government has identified one party who is owed restitution—Jin Sup An, who loaned Mr. Bahn and his colleagues $500,000 to facilitate the Landmark 72 transaction.

Given Harris's lengthy sentence and record, Mr. Bahn is likely the only one that will be able to repay An.  To the extent that the Court orders restitution, Mr. Bahn would be in the best position to make restitution if he receives a non-custodial sentence.  Mr. Bahn has been hardworking his entire life and, notwithstanding the consequences that his arrest had on his employment prospects,

---

[20] See United States v. Richard Novak, No. 05-cr-180 (E.D. Wash.).

[21] See United States v. Perez, No. 16-cr-01164 (S.D. Tex. 2016).

29

has found a niche analyzing and structuring real estate deals in the United States to meet Korean investors' needs and objectives.  That business has grown steadily and shows upside potential.  Mr. Bahn intends to begin making restitution payments immediately, anticipating that he will be shouldering the debt that he and Harris are jointly responsible for.  Mr. Bahn will be best suited to repay that debt if he is permitted to continue working.

*      *      *

For these reasons, we ask that the Court impose a non-custodial sentence, including a term of house arrest, probation, and any other conditions the Court deems appropriate.


Dated:   August 24, 2018                              Respectfully submitted,
             New York, New York

                                                                  s/ Julia Gatto
                                                                  DAVID PATTON
                                                                  Federal Defenders of New York, Inc.
                                                                  BY: JULIA GATTO
                                                                  *Of Counsel*
                                                                  52 Duane Street – 10th Floor
                                                                  New York, New York 10007

                                                                  PATRICK MORONEY
                                                                  SUSHILA RAO
                                                                  Davis Polk & Wardwell LLP
                                                                  450 Lexington Avenue
                                                                  New York, New York 10017
                                                                  *Pro Bono Counsel*

                                                                  *Attorneys for Defendant Joohyun Bahn*