UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

     - v. -                                            :

                                  16 Cr. 831 (NSR)

JOO HYUN BAHN,                                   :
   a/k/a/ "Dennis Bahn,"

                                 :

             Defendant.

                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# GOVERNMENT'S SENTENCING SUBMISSION FOR
# JOO HYUN BAHN


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Daniel S. Noble
Assistant United States Attorney
     -- Of Counsel --

SANDRA MOSER
Acting Chief, Fraud Section,
Criminal Division
U.S. Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20005


Dennis R. Kihm
Trial Attorney
     -- Of Counsel --

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the September 6, 2018 sentencing of Joo Hyun Bahn, a/k/a "Dennis Bahn" ("Bahn" or the "defendant") and in response to Bahn's sentencing memorandum filed on August 24, 2018 ("Def. Mem."). Application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") yields an advisory term of imprisonment of 70 to 87 months.  For the reasons discussed herein, the Government requests that the Court impose a sentence within the Guidelines Range.  Such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of Bahn's offense and relevant conduct, which involved extensive deceitful conduct over a long period of time; to achieve adequate specific and general deterrence; and to promote respect for the law and its legitimate goal of eliminating corruption in international commerce.

## BACKGROUND

The following facts are taken from the final Presentence Investigation Report ("PSR") prepared by the U.S. Probation Office dated May 25, 2018, the prior proceedings in this case, and other record evidence.

### A. Offense Conduct

#### 1. The Landmark 72 Deal

In 2012, a South Korean construction company, Keangnam Enterprises Co., Ltd. ("Keangnam"), completed the construction of Keangnam Hanoi Landmark Tower, which is a 72-story commercial building, as well as two 48-story residential buildings, located in Hanoi, Vietnam (collectively, "Landmark 72"). The construction of Landmark 72 cost more than $1billion, a portion of which Keangnam financed through South Korean banks.

1

In the beginning of 2013, Bahn's father and co-defendant, Ban Ki Sang ("Ban"), served as a senior executive at Keangnam.  Around this time, Keangnam began experiencing a liquidity crisis and sought to refinance or sell Landmark 72 to an investor for approximately $800 million dollars to shore up its capitalization. At the time, Bahn was working in the real estate finance division at a commercial real estate firm ("Firm-1") in Manhattan.  Ban steered Keangnam's business to Bahn in order to secure an investor for Landmark 72. If Bahn were successful, he stood to earn a commission of at least $5 million.

In March 2013, Bahn met Malcolm Harris through a mutual friend in Manhattan. Harris posed as a well-connected arts and fashion consultant with ties to, among other notable figures, the royal family and government officials of a country in the Middle East ("Country-1").  Harris claimed he was in communication with a foreign official in Country-1 ("Foreign Official-1"), who served as the Chief Operating Officer of Country-1's sovereign wealth fund (the "Fund"). Unbeknownst to Bahn or Ban, Harris never had any ties or communications with Foreign Official-1, nor did Harris ever have any legitimate business dealings with the Fund.  Harris falsely told Bahn, however, that he had done other multi-million-dollar deals with Foreign Official-1 and represented that he could use this personal connection to assist Bahn in securing an investor for Landmark 72. In exchange, Bahn agreed to pay Harris a cut of the multi-million-dollar commission that Bahn expected to earn upon the closing of the Landmark 72 deal.

In September 2013, Bahn, with the consent of Ban, attempted to arrange a meeting with the Head of State of Country-1 (the "Head of State") in connection with the Head of State's visit to New York for the United Nations General Assembly. Bahn intended to use the meeting to pitch the Landmark 72 deal directly to the Head of State, instead of using legitimate channels to seek an investment from the Fund.  On September 18, 2013, Bahn sent an email to his

supervisors at Firm-1 seeking authorization to spend $28,000 on "gifts" to present to the Head of State at the meeting. The $28,000 was to come out of a $100,000 deposit that Keangnam had sent to Firm-1 to cover certain brokerage expenses for Landmark 72. Bahn's email had an attached letter signed by Ban, on behalf of Keangnam, authorizing the use of $28,000 on "gift purchases." Bahn's supervisors at Firm-1 refused to authorize the purchase and sent a letter to Ban recommending he discuss any marketing expenses with legal counsel.

On September 24, 2013, Bahn sent an email to a supervisor at Firm-1 in which he attempted to use his family's prominence to try again to obtain authorization to purchase "gifts" for the Head of State. Bahn then drafted a letter to the Head of State offering his family's assurances concerning the "stability and profitability" of Landmark 72.  Bahn asked Harris to deliver the letter to the Head of State while he was still in New York for the United Nations General Assembly and on September 25, 2013, Harris reported to Bahn that the letter had been delivered. The Government is not aware of any evidence, however, that the letter was ever in fact delivered to the Head of State.

On September 25, 2013, Bahn sent an email to his supervisors at Firm-1 in which he reported having discussed the company's unwillingness to pay for the gifts for the Head of State with his father, Ban.  Bahn's email stated, in part: "[O]ur client [Keangnam] was visibly upset due to our 'lack of risk taking'… our client [Keangnam], especially, my father [Ban] is upset on the fact that our family is risking our family's reputation to make the deal work while Marcus and Millichap is sitting on the sideline…"  Ultimately, Bahn was unsuccessful in convincing the Fund to invest in Landmark 72 through his efforts to reach out to the Head of State.

### 2.  The Scheme to Bribe Foreign Official-1

On February 17, 2014, Bahn and Harris exchanged text messages concerning Landmark 72 in which Harris claimed that Foreign Official-1 was willing to help facilitate a sale of Landmark 72 by Keangnam to the Fund, but would have to be paid bribes on the "front-end" and the "back-end" of the deal. Over the next two weeks, Harris and Bahn discussed the bribes and the structure of the deal over a series of text messages, emails, and phone calls, using the code word "roses" for the bribes.

In March 2014, Bahn was recruited to work at another commercial real estate firm in Manhattan ("Firm-2") and ceased working for Firm-1. On March 6, 2014, Bahn signed Firm-2's "FCPA Prevention of Bribery Policy," which, "Prohibits any of its Supervised Persons [including Bahn] from making any corrupt payment to improperly obtain or retain business anywhere in the world."  While employed by Firm-2, Bahn continued to attempt to broker the sale of Landmark 72 to the Fund.

On March 7, 2014, Harris began forwarding to Bahn counterfeit emails from Foreign Official-1 concerning the Landmark 72 deal, which, in reality, Harris had created. The emails requested an upfront payment of $250,000 and a payment of $750,000 after the Landmark 72 deal was approved by the Fund.  After several email exchanges among Bahn, Harris, and purportedly Foreign Official-1, Bahn, on behalf of Keangnam and with Ban's approval, agreed to pay an upfront $500,000 bribe and a $2 million bribe upon the closing of the sale of Landmark 72 to Foreign Official-1 in exchange for Foreign Official-1's assistance in arranging for the Fund to purchase Landmark 72 for $800 million.

In April 2014, Bahn facilitated the drafting of a written agreement between Keangnam and Firm-2 to broker the sale of Landmark 72.  In exchange, Bahn would receive 45 percent of

any commission Firm-2 earned from the sale of Landmark 72.  In addition, Keangnam agreed to pay a $500,000 "deposit" to Firm-2, which would be credited against Firm-2's ultimate commission.  On April 15 and April 16, 2014, Bahn and Ban caused Keangnam to send two wire transfers in the amounts of $410,000 and $90,000, respectively, from Keangnam's bank account in South Korea to Firm-2's bank account in Manhattan, purportedly for the purpose of paying the "deposit."  In reality, however, the wired funds were used by Bahn to facilitate the payment of the "upfront" bribe to Foreign Official-1.

On April 16, 2014, after Keangnam had wired the $500,000 to Firm-2's bank account, Bahn and a co-conspirator ("CC-1") who was a co-worker of Bahn's at Firm-1, arranged to borrow $500,000 from CC-1's business partner, a Korean businessman in Manhattan (the "Businessman").  The Businessman provided a $500,000 blank check to Bahn as a loan, purportedly "secured" by the funds on deposit in Firm-2's bank account.  Bahn and CC-1 did not disclose to the Businessman that the $500,000 was to be used to pay a bribe to Foreign Official-1.  At Harris' instruction, Bahn wrote the check out to "Muse Creative Consulting, LLC" ("Muse"), a company controlled by Harris.  Bahn believed that Harris would then use the funds to pay the upfront bribe to Foreign Official-1 to secure his assistance in convincing the Fund to acquire Landmark 72.

On April 17, 2014, Bahn sent an email to Harris explaining how the money transferred to Firm-1 to fund the payment to Foreign Official-1 had been disguised as a "retainer" since it could not be disclosed that the money was for bribery. The email stated, in part:  "Since the $500,000 is illegal to [a] certain extent, my father [Ban] and myself cannot be involved directly due to our family… Thus, we had to devise a plan to make everything look 'official/legal' on paper and simultaneously not get [Kenagnam] directly involved with [the Fund] regarding the

"roses" matter. On paper, Keangnam has retained [Firm-2] to sell Landmark 72 to [the Fund] and has paid [Firm-2] $500,000 as a retainer to start the job. But nobody knows the dealings under the table."

Harris deposited the $500,000 check into Muse's bank account, but instead of using the funds to pay the purported upfront bribe to Foreign Official-1 as he had promised Bahn, Harris proceeded to spend the money on lavish personal expenses.  Through May 2015, Harris continued to create additional forged emails bearing the name of Foreign Official-1 and forged documents, which had purportedly been sent to Harris from Foreign Official-1 to make it appear that the Fund was progressing with the Landmark 72 deal. Harris forwarded these emails and documents to Bahn in order to prevent him from learning about Harris' fraudulent scheme. Bahn, in turn, forwarded the communications and documents to Keangnam and Ban.

To date, the Businessman has not been repaid by Bahn or his co-conspirators for the $500,000 that they borrowed from him in order to pay the upfront bribe to Foreign Official-1.

### B.  Relevant Conduct:  Bahn's Scheme To Defraud Keangnam

When it became apparent that the efforts to bribe Foreign Official-1 were not bearing fruit (because Harris had stolen the bribe money), Bahn engaged in a fraudulent scheme against Keangnam and its creditors in order to retain his exclusive right to broker the sale of Landmark 72 in exchange for a multi-million-dollar commission.  As part of this scheme, Bahn also converted a portion of the $500,000 that Keangnam had wired to Firm-2, which was purportedly serving as the security for the Businessman's $500,000 loan that Bahn obtained in order to pay the upfront bribe to Foreign Official-1.

From at least May 2014 through May 2015, Bahn made numerous misrepresentations in emails that Bahn sent to Keangnam executives concerning the status of the Landmark 72 deal

and his negotiations with the Fund.  Among other things, Bahn falsely claimed that he had

telephone conversations with Foreign Official-1 about Landmark 72, which never occurred, and

that Bahn had received emails and documents relating to Landmark 72 from Foreign Official-1

and other individuals, which were never drafted or sent by those parties.  As Bahn was well

aware, Keangnam forwarded many of these communications to its creditors, who stood to lose

money if Keangnam failed to sell Landmark 72.  As a result of the fraudulent scheme

orchestrated by Bahn, Keangnam was deprived of valuable information in connection with its

decision-making concerning the company's finances, its efforts to sell Landmark 72, and its

dealings with its creditors.  For example, because Bahn falsely represented that the deal with the

Fund was progressing, Keangnam did not explore other options for disposing of Landmark 72,

which, as discussed below, ultimately led to Keangnam's application for court receivership in

South Korea.

As part of the scheme to defraud, Bahn also made misrepresentations to Keangnam and

Firm-2 in order to obtain approximately $225,000 of the $500,000 that Keangnam had

transferred to Firm-2 in connection with the bribe payment for Foreign Official-1.  Specifically,

Bahn provided a letter dated April 28, 2014, purportedly signed by the Chief Operating Officer

of Keangnam, but which was in fact forged by Bahn, stating that Firm-2 had "earned" the

$500,000 that Keangnam had wired to Firm-2 and that such money "shall not be refundable."

Bahn had represented to Keangnam, however, that the $500,000 was being held in escrow at

Firm-2 pending finalization of the Landmark 72 deal.  Based upon the April 28, 2014 letter, and

in accordance with Bahn's contract with Firm-2, Firm-2 paid Bahn approximately 45%, or

$225,000, of the $500,000 commission.  Approximately $216,666.67 of Bahn's share of the

commission was paid by Firm-2 with a check dated May 15, 2014, which was made out to a

company controlled by Bahn.  Even after Bahn obtained the $225,000, Bahn continued to

misrepresent to Keangnam that Firm-2 held the entire $500,000 "in escrow."

Beginning in or about June 2014, as Keangnam's debt maturity deadlines were

approaching, Bahn began forging emails and documents from Foreign Official-1, the Fund, and

other entities and individuals, which purported to show that the Fund's acquisition of Landmark

72 was still progressing.  Bahn sent these forged documents to Keangnam executives knowing

full well that Keangnam would refrain from exploring other options for disposing of Landmark

72 if it believed that the deal with the Fund was going to close.  For example, on or about June

30, 2014, Bahn sent an email to Harris which stated, in part:

> Today is June 30th and I have to give my clients something. We
> can't just sit on it for [Foreign Official-1] to send us something.
>
> Therefore, in order to buy time, I am going to 'mock-up' a letter in
> [Foreign Official-1's] name containing no other information than
> what he has already given us via email. ...
>
> I'm going to have it mocked up as [Foreign Official-1's] sending
> the letter to [Firm-2] and I'll just forward it to my client so that
> they can show it to their creditors.

Bahn then emailed to Harris a draft of a letter on purported letterhead of the Fund and bearing

the name, purported signature, and contact information for Foreign Official-1.  The letter, which

was addressed to Bahn and Firm-2, stated, in part: "As per your request, this letter will fully

demonstrate [the Fund's] . . . intention to acquire [Landmark 72] from your client, [Keangnam] .

. . to satisfy your client's status report requirement to its creditors."

Later that day, Bahn drafted and forwarded a fake email, purportedly from Foreign

Official-1, attaching the above-described "mocked-up" letter to Ban and another executive at

Keangnam.  Above the forwarded email, Bahn wrote: "Attached is the official document from

8

[the Fund]." In reliance upon this forged letter, Keangnam sought an extension of its debt maturities from its creditors, for which it incurred substantial loan extension fees.

On or about January 5, 2015, Bahn informed Harris that Keangnam's lead creditor had taken control of the company as of January 1 and had given Firm-2 and Bahn until on or about February 15, 2015, to close the Landmark 72 deal with the Fund. On or about January 13, 2015, Bahn emailed a bank confirmation letter purportedly signed by the manager of a branch of a bank located in London, England ("Bank-1"), but which was in fact forged by Bahn (the "Forged Bank Letter"), to Keangnam. The Forged Bank Letter purported to confirm that the Fund had opened an account at Bank-1 for the purpose of acquiring Landmark 72 and that the account had on deposit more than $800 million. Bahn sent the Forged Bank Letter to Keangnam to convince his client that the Fund was getting close to closing on its acquisition of Landmark 72. In truth, Bank-1 never issued the Forged Bank Letter and the Fund never had any such account at Bank-1.

On or about January 28, 2015, Bahn registered a fake domain name for an entity related to the Fund and created a fake email address associated with that domain name for Foreign Official-1. The next day, Bahn used this fake email account to send an email that appeared to have been sent by Foreign Official-1 to Bahn himself. Bahn then forwarded this forged email to Keangnam. The email falsely stated, among other things, that the Fund had submitted Keangnam's proposed Landmark 72 sales contract to the Fund's law firm in London, England, for review. In reality, the Fund had not retained such law firm and was not considering the Landmark 72 contract. Thereafter, Bahn continued to use the fake email account to send additional forged emails to Keangnam, which purported to be from Foreign Official-1 and bore Foreign Official-1's name.

Bahn engaged in the scheme to defraud Keangnam and its creditors notwithstanding his recognition of the importance of the Landmark 72 deal to Keangnam's viability as a company, as well as to Keangnam's creditors and employees.  As Bahn wrote in an email to Harris on or about December 14, 2014: "We have the life of an entire firm and the lives of almost 1,000 employees in our hands.  They need the liquidity from this deal to stay afloat."  Similarly, on or about March 10, 2015, Bahn wrote to Harris: "[M]y client [Keangnam] is in jeopardy of financial meltdown and they have till end of March to cure.  In all seriousness, they really will blame [the Fund] for denying them of other opportunities to sell Landmark 72 due to [the Fund's] promises that were made through us."  Nevertheless, Bahn continued to lie to Keangnam and its creditors regarding the status of the Fund's purported acquisition of Landmark 72 through at least May 2015.

Ultimately, Keangnam was taken over by its creditors after it failed to raise capital through the sale of Landmark 72, and entered court receivership in South Korea shortly thereafter.

### C.  Procedural History

On December 15, 2016, a grand jury sitting in the Southern District of New York returned Indictment 16 Cr. 831 (ER), which charged Bahn in nine counts.  Count One charged Bahn with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), in violation of 18 U.S.C. § 371.  Counts Two through Four charged Bahn with substantive violations of the FCPA, in violation of 78 U.S.C. §§ 78dd-2.  Counts Five and Six charged Bahn with conspiracy to commit money laundering and money laundering, in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(2)(A), respectively.  Count Ten charged Bahn with wire fraud, in violation of 18 U.S.C. § 1343.  Count Eleven charged Bahn with aggravated identity theft, in violation of 18 U.S.C.

§ 1028A.  Count Twelve charged Bahn with engaging in monetary transactions in criminally

derived property, in violation of 18 U.S.C. § 1957(a).

On January 10, 2017, Bahn was arrested in New Jersey.  On January 5, 2018, Bahn pled

guilty, pursuant to a plea agreement, to Count One and Four of the Indictment.

### D.  Criminal History

Aside from an outstanding 2001 Michigan state warrant for driving with a suspended

license, Bahn has no prior criminal convictions, arrests, or pending charges.  (PSR ¶¶ 71-76).

### E.  The Presentence Report

In the PSR, the Probation Office correctly determines that Bahn's total offense level

under the Sentencing Guidelines is 27 (PSR ¶ 70), calculated as follows:

- The November 1, 2016 Guidelines manual applies.

- Counts One and Four are grouped, pursuant to U.S.S.G. § 3D1.2(b), as the counts
  involve the same victim and two or more acts or transactions connected by a common
  criminal objective or constituting part of a common scheme or plan.

- The base offense level for the FCPA violation is 12, pursuant to U.S.S.G.
  § 2C1.1(a)(2).

- An 18-level enhancement is warranted because the value of the benefit received or to
  be received in return for the bribe payment exceeded $6,500, specifically, more than
  $3,500,000 but less than $9,500,000, pursuant to U.S.S.G. §§ 2C1.1(b)(2) and
  2B1.1(b)(1)(J).

- A 3-level reduction is warranted because Bahn timely accepted responsibility,
  pursuant to U.S.S.G. § 3E1.1.

(PSR ¶¶ 61-70).  Because Bahn has zero criminal history points, he is in Criminal History

Category I.  (PSR ¶ 73).  Based on an offense level of 27 and a Criminal History Category of I,

the Probation Office correctly calculates Bahn's Sentencing Guidelines range is 70 to 87 months'

imprisonment.  (PSR ¶ 114).

## DISCUSSION

### A. Applicable Law

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range": that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 55 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)); *accord Beckles* v. *United States*, 137 S. Ct. 886, 894 (2017) ("The Guidelines thus continue to guide district courts in exercising their discretion by serving as 'the framework for sentencing.'" (quoting *Peugh*, 133 S. Ct. at 2083)).

After calculating the Guidelines range, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); "the kinds of sentences available," 18 U.S.C. § 3553(a)(3); the Guidelines range itself, *see* 18 U.S.C. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see* 18 U.S.C. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," 18 U.S.C. § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). In determining the appropriate sentence, the

statute directs district courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall* v. *United States*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita* v. *United States*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**B.**     **Guidelines Calculation**

The parties dispute the appropriate value to be used to calculate the enhancement under

U.S.S.G. § 2C1.1(b)(2) for the "benefit" that Bahn expected to receive through the FCPA bribery

scheme.  Section 2C1.1(b)(2) provides:

> If the value of the payment, the benefit received or to be received
> in return for the payment, the value of anything obtained or to be
> obtained by a public official or others acting with a public official,
> or the loss to the government from the offense, *whichever is
> greatest*, exceeded $6,500, increase by the number of levels from
> the table in § 2B1.1 (Theft, Property Destruction, and Fraud)
> corresponding to that amount.

(emphasis added).  The Commentary to Section 2C1.1 provides, in pertinent part, that "[i]n a

case in which the value of the bribe exceeds the value of the benefit, or in which the value of the

benefit cannot be determined, the value of the bribe is used because it is likely that the payer of

such a bribe expected something in return that would be worth more than the value of the bribe."

U.S.S.G. § 2C1.1 cmt.  The Commentary further notes that "for deterrence purposes, the

punishment should be commensurate with the gain to the payer or the recipient of the bribe,

whichever is greater."  *Id.*

Here, the "benefit" to Bahn that was "to be received in return for the payment" was the

commission that Bahn and his co-conspirators expected to earn upon the closing of the

Landmark 72 deal.  In other words, the commission represented the amount of "benefit" that

Bahn expected to obtain as a result of the bribery scheme.  This amount is readily determined

based upon the brokerage contracts setting forth the commission percentages and the anticipated

sale price for Landmark 72.  (*See* PSR ¶ 50 & n.1).  In connection with the Landmark 72 deal,

Bahn ultimately arranged for Keangnam to enter into two brokerage agreements, which remained

in place until Keangnam was taken over by its creditors in early 2015.  Under the first operative

brokerage agreement between Keangnam and Firm-2, Firm-2 stood to earn a commission of 0.7% of the $800 million anticipated sales price for Landmark 72, or $5.6 million.  Of that amount, Bahn was entitled to 45% under his contract with Firm-2.  Thus, Bahn stood to earn $2.52 million under the first brokerage agreement.  Under the second operative brokerage agreement entered into between Keangnam and Galaxy Realty (a firm controlled by CC-1), Galaxy expected to earn $8.9 million from the sale of Landmark 72.  Of this amount, Bahn promised to pay Harris half.  Thus, under the second brokerage agreement, Bahn stood to earn an additional $4.45 million commission.  Altogether, under the operative brokerage agreements that remained in place during the bribery scheme until the Landmark 72 deal collapsed, Bahn expected that he would receive a commission totaling approximately $6.97 million upon the closing of the Landmark 72 deal.

Bahn argues that instead of using the amount of benefit that he stood to receive through the FCPA bribery scheme, the Court should instead use the amount of the bribe itself, *i.e.*, the $500,000 that Bahn gave to Harris to pay to Foreign Official-1.  (*See* Def. Mem. 17-20).  Bahn's argument is misplaced for at least two reasons.  First, even assuming, *arguendo*, that the amount of the payment is the appropriate measure for the Section 2C1.1(b)(2) enhancement—which it is not—the correct amount would not be $500,000, but rather $2.5 million, which was the full amount of the bribes (both "front-end" and "back-end") that Bahn and his co-conspirators agreed and intended to pay to Foreign Official-1.  *See* U.S.S.G. § 2B1.1 cmt. n. 3(A) ("[L]oss is the greater of actual or intended loss.").  Moreover, intended loss (which, in the context of a bribery scheme encompasses the total intended bribe payments) "means the pecuniary harm that was intended to result from the offense" and "includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in

which the claim exceeded the insured value)." *Id.* cmt. n. 3(A)(ii).  Thus, even if the second

"back-end" $2 million bribe payment never materialized because Harris defrauded Bahn and his

co-conspirators, it nevertheless is counted under Section 2B1.1 for purposes of calculating "loss"

under the Guidelines.  Such a $2.5 million figure would result in a 16-level enhancement,

pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(I)—only two levels lower than the offense

level calculated by the Government and Probation—and result in a Guidelines range of 57 to 71

months' imprisonment.

Second, this simply is not a case contemplated by the Guidelines Commentary where "the

value of the benefit cannot be determined" such that the amount of the bribe payment should be

used for purposes of calculating the Section 2C1.1(b)(2) enhancement.  Without even attempting

to engage with the extensive available documentary evidence in this case, Bahn baldly asserts

that the record in this case does not "allow[] for a 'reasonable estimate' of the benefit."  (*Id.* at 18

(quoting *United States* v. *Bahel*, 662 F.3d 610, 646 (2d Cir. 2011)).  Bahn's contention is

unavailing and his reliance on *Bahel* misplaced.  In *Bahel*, the Second Circuit made clear that

"the principles relating to estimating losses are equally applicable to estimating gains."  662 F.3d

at 646.  Thus, the Second Circuit reiterated that "the Guidelines do not require that the

sentencing court calculate the amount of loss with certainty or precision," but rather "need only

make a reasonable estimate of the loss, given the available information."  *Id.* (internal quotation

marks and citations omitted).  Contrary to Bahn's contention, such a "reasonable estimate" of the

benefit that Bahn expected to earn as a result of the bribery scheme is readily attainable in this

case based upon the operative brokerage contracts.[1]

---

[1]     In support of his argument, Bahn cites *United States* v. *Nelson*, 732 F.3d 504, 523-24 (5th
Cir. 2013).  *Nelson* is inapposite.  In *Nelson*, the defendant, a mayor, wrote a letter in his official
capacity supporting a company's proposed waste disposal project to potential private investors in

Bahn argues, without pointing to any record evidence, that the commission that he and his co-conspirators expected to earn "varied widely over the course of the negotiations" and was "constantly in flux." (Def. Mem. 18). As such, Bahn contends that the Court "would need to pick an arbitrary point during negotiations and evaluate conflicting statements by the participants." (*Id.* at 19). Not true. Despite Bahn's best efforts to conjure a parade of horribles, the calculation of the expected benefit in this case is straightforward. The brokerage agreements that the Government submits should serve as the basis for the benefit calculation were the latest operative versions entered into by Keangnam, Firm-2, and Galaxy, and, therefore, provide a reasonable basis for calculating the commission that Bahn anticipated to earn from the Landmark 72 deal. Because Bahn cites no other contemporaneous documentary evidence to call these contracts into question, the Court may reasonably rely upon them in calculating the anticipated benefit to Bahn from the bribery scheme.

Bahn argues that the "most logical" point to calculate the expected benefit would be the point at which Bahn paid the $500,000 bribe. He contends, in a footnote, that at that point in time he only expected to receive a commission of $300,000. (Def. Mem. 19). Geting to this $300,000 commission number, however, requires some fuzzy math. First, Bahn argues that in April of 2014[2] he presented two conflicting advisory services agreements with different sales

---

exchange for cash bribes. *Id.* at 523. The district court assigned a value of $2 million to the letter based upon evidence that the defendant expected the company would use the letter "to obtain two to three million dollars in private investment money" that would ultimately "result in a large sum of money to [the defendant] personally." *Id.* (internal quotation marks omitted). The Fifth Circuit held that the district court's reliance upon the defendant's "general expectation" that the letter would "generate 'a large sum of money'" was error. *Id.* at 524. Here, by contrast, the brokerage contracts plainly set forth the commissions that Bahn and his co-conspirators expected to earn through the bribery scheme, and is more than sufficient to make a "reasonable estimate" of the benefit Bahn expected to obtain.

[2] Bahn erroneously writes that this occurred in April 2015, not 2014.

prices and commission rates to his client and his employer.[3]  He then concludes that if you assume the lower sales price of $700 million controls and the higher commission to Colliers controls, that Bahn would be left with $4.3 million in commission to himself.  Last, Bahn argues that if you subtract $4 million based on an email he sent in December of 2014 where he mentioned paying Harris $4 million dollars that you arrive at a total of $300,000.

This analysis is convoluted and a not-too-thinly veiled attempt to confuse the record.  It assumes that somehow once the Landmark 72 deal was finalized that both agreements would control in a way that least benefits Bahn.  Yet there is no need to analyze how such a scenario would play out since, as often happens in real estate transactions, these agreements were later superseded by another agreement which resulted in a total commission to Bahn, as outlined in the PSR, of $6.97 million.  (PSR ¶ 50).  Further, even the email Bahn cites for his position that Harris was entitled to $4 million undercuts his argument.  In that email, Bahn writes, "Based on that agreement your fee is *capped* at $4MM. The total fee is $16MM and my firm takes 50% and I get $8MM and we split $4MM each."  In this very email Bahn acknowledges that he is entitled to $4 million, an amount within the range of $3.5 to $9.5 million.

In short, Bahn's objection to the Section 2C1.1(b)(2) enhancement calculation is without basis in law or fact.  Accordingly, the Court should adopt the calculation of benefit set forth in the PSR.

---

[3] The very fact Bahn presented two competing versions, each apparently designed to present a more favorable outcome to the recipient—a higher sales price to Keangnam and a higher commission to his employer—shows that from the very inception of this deal Bahn was intent to engage in fraud to benefit himself.

### C.     The Section 3553(a) Factors Support a Guidelines Sentence

A term of imprisonment within the applicable Guidelines range is sufficient, but not greater than necessary, to comply with the purposes of sentencing.  The Section 3553(a) factors most applicable in this case include the nature and circumstances of the offenses, the seriousness of the offenses, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, and the history and characteristics of the defendant.

### 1.     The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment

Bahn's crimes are serious and warrant a Guidelines-range sentence.  Even if for the sake of argument one limits the universe of such conduct to that charged in the indictment, Bahn committed at least the following acts:

- Bahn conspired with others, including executives at a major Korean company, to pay $2.5 million in bribes to Foreign Official-1, a high-ranking government official in the Middle East, to induce Foreign Official-1 to cause the Fund to release $800 million for the benefit of himself, his father, Keangnam, and others.

- Bahn conspired with others to launder the funds for the attempted upfront bribe payment by structuring the payment so as to make it appear to be a legitimate deposit relating to the Landmark 72 transaction.

- In September 2013—well before Harris proposed the idea of paying bribes to Foreign Official-1—Bahn attempted to arrange a meeting with the Head of State of Country-1 through his family's connection, at which meeting Bahn would present the Head of State of Country-1 with approximately $28,000 in "gifts."

- Bahn repeatedly attempted to trade on the prominence of his family in order to conclude the Landmark 72 transaction.[4]

- Bahn lied to executives at Keangnam—his own client to whom Bahn owed a fiduciary duty—in order to trick Keangnam and its creditors into believing that the Fund was close to acquiring Landmark 72, even when he knew that Keangnam was on the verge of bankruptcy.  Notably, Ban lied—repeatedly—to his own father about the progress of Landmark 72 deal.

- Bahn created sophisticated forged emails, letters, and other documents purporting to show progress on the Landmark 72 transaction.  Such forgeries included emails in the name of Foreign Official-1—which plainly constituted aggravated identity theft, an offense that carries a mandatory consecutive sentence of 24 months—sent from a fake domain name Bahn created; a letter purporting to be on Fund letterhead committing the Fund to the acquisition of Landmark 72; and the Forged Bank Letter, which appeared to show that the Fund had an account at a major international bank in London with funds on deposit in excess of $800 million in anticipation of the acquisition of Landmark 72.

- Bahn presented a letter to Firm-2, in which he forged the signature of Keangnam's Chief Operating Officer, falsely stating that Firm-2 had "earned" $500,000, in order to fraudulently obtain 45% of that amount, or $225,000.  Subsequently, Bahn lied to Keangnam that the full $500,000 was still on deposit in Firm-2's account pending the closing of the Landmark 72 deal.

---

[4] In his Sentencing Memorandum Bahn accuses the government of timing the unsealing of the indictment to harm a member of his family.  (Def. Mem. 12–13).  This spurious and unfounded allegation is not worth addressing, save to say that it now appears Bahn is once again trying to use his family name to his benefit, this time for a lower sentence.

This list does not exhaust the fraudulent acts Bahn undertook during the course of the FCPA bribery scheme, but it flatly demonstrates the seriousness of his crimes: Bahn committed multiple, complex crimes that involved an extremely high level of deceit; he committed these crimes over the course of over two years—from at least March 2013 until at least May 2015; in perpetrating his crimes he used the personal identifying information of Foreign Official-1, a government official in a significant position of authority, among other individuals; and Bahn's sole motivation in committing these crimes was plainly pure greed.  Plainly, Bahn's crimes were extremely serious.

Further, Bahn's crimes caused real harm, particularly to Keangnam, Bahn's own client. Keangnam was a company facing a serious liquidity crisis, and it sought to sell Landmark 72 in order to shore up its balance sheet.  Bahn had regular conversations with executives at Keangnam, including his father, in which he discussed the seriousness of the problem.  In his own words he told Harris, "We have the life of an entire firm and the lives of almost 1,000 employees in our hands.  They need the liquidity from this deal to stay afloat."  Despite this, Bahn persisted in repeatedly lying to Keangnam in order to protect his chance to earn a multi-million dollar commission.  And the harm Bahn caused was not limited to Keangnam, but also included others, such was the Businessman from whom Bahn borrowed the $500,000 to pay the bribe and who has yet to be repaid.

In short, the gravity of Bahn's crimes and the impact they had on Keangnam, the Businessman, Foreign-Official-1, and others warrant a substantial punishment.

### 2. The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The law recognizes two forms of deterrence, specific deterrence, where a court looks to what sentence will deter the defendant from committing future crimes, and general deterrence,

where a court looks to what sentence will send a message to other would-be criminals about the consequences of their actions.  Both are relevant in devising an appropriate sentence for Bahn.

While Bahn is not a recidivist in that he has not previously been convicted of crimes, his actions demonstrated that he was willing to engage in crime after crime in order to benefit himself.  For example, even after he had arranged the attempted upfront $500,000 bribe payment to Foreign Official-1, he then cause Keangnam to transmit the funds to Firm-2 in order to conceal the nature of the bribe payment.  Then, after Keangnam deposited the funds in Firm-2, Bahn forged a letter causing Firm-2 to release 45% of those funds for his personal benefit. At the same time, Bahn was lying to his coconspirators, including his own father, Ban, in order to make them believe that the Landmark 72 transaction was progressing when it had in fact stalled. Significant deterrence is necessary here, as Bahn is a serial criminal opportunist who will only be deterred by a significant sentence.

In addition, principles of general deterrence warrant a significant term of imprisonment. White collar crimes, particularly corporate crimes, are hard to detect and time-consuming to investigate.  Crimes like FCPA violations and international money laundering are even more difficult to detect in that the evidence lies in multiple countries, making it all the more difficult to obtain and use.  Strict sentences are necessary in order to deter future criminals who would contemplate such conduct.

### 3.    The History and Characteristics of the Defendant

Bahn's behavior demonstrates that he believes that the rules do not apply to him.  He has shown himself willing to lie and cheat repeatedly to benefit himself at the expense of others.  His conduct falls squarely within the contemplated Guidelines range.

Bahn raises certain claims about his history and characteristics that he contends are mitigating circumstances.  None of these factors support Bahn's request for a downward variance.

First, Bahn insists that while he acknowledges responsibility for his actions, "there was no intent to harm." (Def. Mem. 20–22). Bahn's support for this assertion is unclear, but it appears to be grounded in Bahn's assertion that he received no FCPA training and that his actions were done for the benefit of his family.[5] As an initial matter, what the relevance of FCPA training has to do with his intent is unclear: Bahn agreed to pay $2.5 million in bribes, which he knew, by his own admission, was "illegal." (PSR ¶ 40). Bahn then hid the transaction because he knew what he was doing was a crime. (*Id.*). Moreover, Bahn's claim that what he was doing was for the benefit of his family is undercut by the fact that Bahn was lying to his own father about the progress of the Landmark 72 transaction. It is difficult to see how Bahn's criminal conduct would ever have benefited his family—indeed, by Bahn's own account, it was the Government's charges brought against him and his father that undermined his uncle's presidential run in South Korea. Contrary to his assertions, Bahn acted with a clear, corrupt intent that was motivated by his own greed.

Second, throughout Bahn's memorandum he attempts to distinguish his conduct from that of his codefendant, Malcolm Harris. In reality, however, Bahn and Harris are extremely similar fraudsters in many respects: they were both willing to commit fraud to benefit themselves personally; they were both driven by greed; they were both capable of sustaining a significant level of deceit over a long period of time; they were both willing to compromise the dignity of Foreign Official-1 by stealing his identity; and they were both willing to launder money. But in at least one important respect Bahn is differently situated than Harris: while Harris was willing to commit fraud on the (relatively) small scale, by fraudulently obtaining a few hundred thousand dollars at a time, Bahn believed he was corruptly inducing a *foreign government* to give up *$800 million*

---

[5] It is not disputed, however, that Bahn *signed* an FCPA certification at Firm-2 in March of 2014, contemporaneous to his discussions with Harris about making the bribe payments to Foreign Official-1. Bahn's claim of ignorance of the FCPA, therefore, rings hollow.

*dollars* through bribery (and thereby earn almost $7 million for Bahn).  The scale of Bahn's criminal conduct dwarfs that of Harris, recidivist or not.

Further, Bahn says that Harris "hatched the bribery scheme" and "was the first to recommend bribing [Foreign Official-1] . . . and, once Keangnam was on board, drove the scheme." (Def. Mem. 21–22)  The implication is that Bahn was a passive conduit whom Harris duped into being a go-between with Keangnam.  This is totally contrary to the evidence.  The below is an excerpt of the text message conversation between Bahn and Harris where the bribery scheme was "hatched."  It plainly shows that Bahn had no qualms about committing bribery to get the Landmark 72 deal done:

> HARRIS:  Dennis - I've been working with my new . . . contact [in Country-1] for the past few days . . . and between us . . . these guys are all alike . . . at least [HARRIS's former purported contact in Country-1] was a little more subtle with his 'pay-for-play' approach . . . the new guy that's been assigned to the 'calendar' has pretty much spelled it out . . . that these slots have a price . . . .

> BAHN:  Hi Malcolm.  Thanks for the feedback.  Please tell him there is a $13,000,000 fee we can collect if this deal closes with [the Fund] and we are happy to share the fee with him as long as he gets us in front of the [Head of State] and help us get his approval.

What is striking is that Bahn's immediate response to Harris's suggestion that they consider a bribe is to have Harris speak to Foreign Official-1 and offer to share $13 million as a bribe. There is no indication Harris had to *convince* Bahn—for instance, after a protracted period of negotiation—or forced an unwanted course of conduct down Bahn's throat.  To the contrary, Bahn was a willing and eager participant in the bribery scheme as long is it got the deal done and earned him the millions of dollars he was expecting to earn from the Landmark 72 deal.

### 4.  Bahn Did Not Cooperate With the Government

Bahn contends that he should get a lower sentence based upon his "cooperation" with the Government.  In support of this argument, Bahn makes a number of assertions in his

memorandum that require clarification/correction.  (Def. Mem. 13–14, 25–26)  Bahn identifies

three areas of cooperation: statements made at his arrest; statements made through his attorney to

the government; and statements made through his attorney to the SEC.

Bahn contends that he "immediately accepted responsibility at the time of his arrest . . .

[by providing] detailed information about his conduct." (*Id.* at 25).  It would be more accurate to

say that when Bahn was arrested he made a confession.  Bahn declined to sit for a later proffer

with the government.[6]  However, after Bahn entered a plea of guilty, the government requested

an attorney proffer on certain very limited areas of inquiry.  Bahn's attorney provided a summary

of what Bahn would likely say as to those limited areas.  Based on that response the Government

did not seek to further interview Bahn.

Prior to filing this memorandum, the Government also communicated with the Securities

and Exchange Commission ("SEC"), with whom Bahn's counsel represents Bahn has reached a

separate resolution.  The SEC indicated that following Bahn's arrest, Bahn's counsel approached

the SEC about the possibility of cooperating.  Pursuant to the procedures outlined in the SEC's

Enforcement Cooperation Program, the SEC met with Bahn's counsel who provided an summary

of what Bahn would likely tell them if interviewed.  Thereafter no further action was taken.

Based on the foregoing, it is not accurate to say that Bahn has in any sense "cooperated,"

much less provided "substantial assistance" to the government or the SEC.  To the extent Bahn is

given any credit for the statements Bahn made to the Government, such conduct is already

captured in the three-point reduction he will receive under the Guidelines for acceptance of

responsibility.  *See, e.g.*, U.S.S.G. § 3E1.1, App. Note 1 ("In determining whether a defendant

---

[6] Bahn notes that he attempted to secure a New York-based attorney for his father and codefendant. *Id.* at 13–14.  The government has no further information other than the representations of Bahn's counsel as to the accuracy of that representation.

qualifies [for an acceptance of responsibility reduction under Section 3E1.1(a)] . . . appropriate considerations include . . . (A) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable . . . .").

### 5.   The FCPA Sentences Relied Upon by Bahn Are Inapposite

Finally, Bahn argues that he should receive a non-custodial sentence based on a survey of sentences given in FCPA matters, attached to his memorandum.  (Def. Mem. 27-29).  Bahn fails to appreciate, however, that FCPA matters, which are often committed on behalf of corporate entities and in conjunction with others, often involve substantial assistance opportunities.  Thus, many of the cases cited by Bahn are sentences issued after a Court granted the Government's motion for a downward departure based upon substantial assistance under Section 5K1.1.  For example, Bahn cites three sentences in which defendants who had similar but lower Guidelines ranges to Bahn received probationary sentences.  (*Id.* 28-29 (citing *United States v. Novak*, No. 05-cr-180 (E.D. Wash. 2005); *United States v. Hirsch*, No. 15-cr-00358 (D. N.J.); *United States v. Perez*, No. 16-cr-01164 (S.D. Texas 2016)).  However, per publicly available records, in all three of those cases the Government moved for, and the district courts granted, a motion for downward departure.  Here, Bahn has not cooperated with the Government's investigation and the Government is not moving for downward departure under Section 5K1.1.  As such, these sentences relied upon by Bahn are simply inapposite.

In sum, in light of the Section 3553(a) factors, including the nature and circumstances of the offenses, the seriousness of the offenses, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, and the history and characteristics of the defendant, a Guidelines-range sentence of 70-87 months' imprisonment is appropriate.

26

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should sentence Joo Hyun Bahn to a term of imprisonment within the Guidelines range of 70 to 87 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to accomplish the goals set forth in Title 18, United States Code, Section 3553(a).  In addition, the Government will submit proposed forfeiture and restitution orders in advance of sentencing.


DATED:          August 31, 2018
                New York, New York


                                              Respectfully submitted,


        GEOFFREY S. BERMAN                      SANDRA MOSER
        United States Attorney                  Acting Chief, Fraud Section,
                                                Criminal Division

By:     _____/s/_____   By:   _____/s/_____
        Daniel S. Noble                         Dennis R. Kihm
        Assistant United States Attorney        Trial Attorney
        (212) 637-2239                          (202) 616-2999