UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -   No. 16-cr-831(ER)

JOOHYUN BAHN,

            Defendant.

**REPLY SENTENCING SUBMISSION ON BEHALF OF JOOHYUN BAHN**

DAVID PATTON
Federal Defenders of New York, Inc.
BY: JULIA GATTO
*Of Counsel*
52 Duane Street – 10th Floor
New York, New York 10007

PATRICK MORONEY
SUSHILA RAO
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
*Pro Bono Counsel*

*Attorneys for Defendant Joohyun Bahn*

The government's sentencing submission oversimplifies several key issues, which we address below. But perhaps most significant is what the submission does not say. It does not mention Probation's recommended 24-month sentence. It does not dispute that courts have imposed below-Guidelines sentences in over 90% of FCPA cases. And it does not contest that executives at the highest levels of Keangnam authorized the bribe payment in this case.

There is no question that the scheme that Mr. Bahn thought he was participating in was a serious one, or that his actions were criminal and unacceptable. But § 3553(a) requires a more thorough inquiry. A sentence anywhere near the range the government seeks would be far greater than necessary to achieve the purposes of sentencing.

1. Sentencing Disparity

Perhaps the most misguided aspect of the government's submission is how it handles the fact that Malcolm Harris faced a lower Guidelines range. The submission could acknowledge that such obviously inequitable outcomes occasionally result from a well-intentioned, but imperfect, system that attempts to assign numbers to inherently qualitative factors—and the need to cabin such calculations "by common sense." *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006). Instead, the government's submission doubles down. It argues that Mr. Bahn should face a higher Guidelines range—and nearly double the prison sentence—because he is a "similar fraudster" who engaged in conduct on a larger scale.

This argument only highlights the well-recognized limitations of the Guidelines: they often fail to differentiate between conduct like Mr. Bahn's and Harris's, reducing that conduct to a number—which is why the Guidelines are only one of the § 3553(a) factors. While it is true that both Mr. Bahn and Harris made misrepresentations to Keangnam about the deal, the similarities stop there. Mr. Bahn did so to provide more time for the deal to close—a transaction in which Keangnam

was to receive $800 million for a building that, as the government acknowledges, cost $1 billion to build.  Mr. Bahn's father, and other senior executives at Keangnam, encouraged him to close the sale.  Harris, meanwhile, made the misrepresentations as part of a carefully crafted scheme to steal $500,000.  He did so after having been convicted of a felony in this court, after having serving a prison term, and while simultaneously engaging in similar schemes to defraud.

Probation relied heavily on this sentencing disparity in making its recommendation for a significantly below-Guidelines sentence, writing that Harris's conduct was "arguably more egregious" than Mr. Bahn's.  We agree.

2.  Mr. Bahn's Cooperation

The government's submission also attempts to minimize Mr. Bahn's cooperation and acceptance of responsibility.  These assertions are misplaced, and several require clarification or context.

The submission first attempts to downplay the truthful answers that Mr. Bahn provided to FBI agents after his arrest, asserting only that these statements should be characterized as a "confession."  It is not clear why this distinction matters, but in a sense it underscores the key point: Mr. Bahn immediately accepted full responsibility for his conduct and assisted law enforcement.

Mr. Bahn's arrest was not the first time he was questioned about his involvement.  When the Korean media first broke the story about the bribe, Mr. Bahn extensively discussed the events with his supervisor at Colliers and the firm's general counsel.  He was formally interviewed by an outside law firm that Colliers retained to investigate the conduct shortly before the firm disclosed the conduct to the government in May 2015.  When Mr. Bahn was arrested in January 2017, it is not as though agents outsmarted Mr. Bahn and extracted a "confession" from him.  He was accepting responsibility and trying to be helpful.

The government also tries to minimize Mr. Bahn's later cooperation. While it is true that he could not become a formal cooperator—a plea to all of the counts in the indictment would have resulted in mandatory deportation, regardless of the sentence—he made every effort to assist law enforcement. After his guilty plea, the United States Attorney's Office approached defense counsel and asked for Mr. Bahn's recollections on two topics, writing in a follow up email: "While we are not in a position to consider Mr. Bahn a cooperator, if we get truthful answers to these questions, at sentencing you could represent to the Court that Mr. Bahn provided certain information to the government in furtherance of its investigation." Although Mr. Bahn had no obligation to provide this information, he did so.

Similarly, after Mr. Bahn's arrest, the SEC informed his counsel that it intended to bring an enforcement action against him; his counsel indicated that Mr. Bahn would be willing to cooperate. After several months with no contact, the SEC reached out after Mr. Bahn's guilty plea and asked if he would still be willing to cooperate. At the SEC's request, Mr. Bahn's attorneys engaged in hours-long proffers.

We do not mean to suggest that Mr. Bahn deserves a 5K letter. But the government's assertion that Mr. Bahn "did not cooperate" is, at best, a matter of semantics. Nor should the Court adopt the government's puzzling suggestion that Mr. Bahn's voluntary efforts were required to receive the standard three-point Guidelines reduction. Mr. Bahn has done far more than plead guilty. He has done virtually everything the government has asked of him. We ask the Court to take those efforts into account.

3. Guidelines Calculation

Both sides have extensively described their positions on the "expected benefit" provision of the Guidelines (§ 2C1.1), and we will not repeat those arguments. Simply stated, we submit that the

3

Court should look to the benefit that Mr. Bahn expected at the time the bribe payment was made. *See United States v. Trinh*, No. 2:15-CR-00179(A)-CAS, 2017 WL 3835138, at *6 (C.D. Cal. Aug. 31, 2017) (explaining that the provision should be applied by "looking at the benefit to be received at the time the bribe took place"). After all, the underlying offense is the use of the mail or wires in furtherance of a bribe, and conspiring to do the same. It is only logical that the expected benefit be calculated at the time those wires are used, or at the time an agreement is reached to do so. The government offers no reason why it is more logical to calculate the benefit based on the participants' understanding at the time the scheme ended or was discovered.

Here, there is no question that determining what benefit Mr. Bahn expected at the time of the $500,000 wire is complex. The government does not attempt this calculation, apart from dismissing the defense's approach as "fuzzy math." This disagreement, however, simply underscores why $500,000 should be used for the Guidelines calculation: the figure is readily ascertainable, does not require the weighing of competing assertions, and is undisputed.[1]

    4.    <u>Deterrence</u>

The government argues that a within-Guidelines sentence is necessary to deter individuals who are contemplating an FCPA crime. It appears that few other courts have accepted this argument. The government's submission does not address the fact that 93% of courts have imposed a below-Guidelines sentence in FCPA cases, or that nearly 60% of individual defendants in such cases receive one year of jail or less. While it is true that some of those sentences involved formal

---

[1] The government suggests that $2.5 million should be used—the $500,000 plus the $2 million that the parties discussed paying upon completion of the deal. While this $2 million payment depended on a series of contingent events, it is a more reliable figure than the $6.97 million that the government has proposed.

cooperation agreements, that response is of limited force here, where Mr. Bahn has made significant efforts to assist law enforcement.

With respect to specific deterrence, the government asserts that "Bahn is a serial criminal opportunist who will only be deterred by a significant sentence." This is an utterly unsupported claim. If anyone, there is only one "serial criminal opportunist" involved in this case, and he is currently serving a sentence that is half the length that the government seeks.

The government's assertion also ignores the serious consequences that Mr. Bahn has already faced and will continue to face. He has lost two jobs, will owe $1 million, and will be deported if he receives a sentence of 12 months or more (and will be inadmissible regardless of the sentence). These consequences are more than sufficient to ensure that Mr. Bahn—who has never before been arrested and has continually worked hard to provide for his family—will not break the law again.

Dated: September 4, 2018
       New York, New York

Respectfully submitted,

s/ Julia Gatto
DAVID PATTON
Federal Defenders of New York, Inc.
BY: JULIA GATTO
*Of Counsel*
52 Duane Street – 10th Floor
New York, New York 10007

PATRICK MORONEY
SUSHILA RAO
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
*Pro Bono Counsel*

*Attorneys for Defendant Joohyun Bahn*